IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

### OCTOBER TERM, 1887.

PRESENT—L. E. BLECKLEY, . . . . . . . . CHIEF JUSTICE.
         M. H. BLANDFORD, . . . . . . . . ASSOCIATE  "
         T. J. SIMMONS, . . . . . . . . . . ASSOCIATE  "

MERCK *vs.* THE AMERICAN FREEHOLD LAND MORTGAGE COMPANY, OF LONDON, LIMITED.

1. Where the lender of money neither takes nor contracts to take anything beyond lawful interest, the loan is not rendered usurious by what the borrower does in procuring the loan and using its proceeds. Thus, that the borrower contracts with one engaged in the intermediary business of procuring loans, to pay him out of the loan for his services, and does so pay him, will not infect the loan, the lender having no interest in such intermediary business or its proceeds.

2. By using intermediaries as channels of transmission for papers, relying upon their inspection of property and examination of titles, made at the borrower's instance, and forwarding the money through them also at his instance, the lender does not constitute them his agents to make the loan, and is not chargeable with the consequences of dealings between them and the borrower, whether those dealings be public or private, known or unknown.

3. It is lawful to contract for interest on interest overdue, and for payment by the debtor of reasonable attorneys' fees on sums, both principal and interest, which have to be collected by suit.

4. Where the errors, if any, committed on the trial were harmless,

79  213
85  602
86  760
87  642

79  213
97  329

79  213
101  360

79  213
106  248
106  511

79  213
d111  247

79  213
115  884

79  213
e120  393
f120  394
120  395

the verdict being the same as it must have been had there been no error by court or jury, a new trial will not be granted.

December 7, 1887.

Interest and Usury. Contracts. Principal and Agent. New Trial. Practice in Supreme Court. Before Judge WELLBORN. Hall Superior Court. August Term, 1887.

On January 20, 1886, the American Freehold Land Mortgage Company, of London, Limited, alleging itself to be a corporation under the laws of Great Britian, brought suit in the superior court of Hall county against George B. Merck on a promissory note. This note was dated November 16, 1883, was made by the defendant to J. K. O. Sherwood or order, payable at the office of the Corbin Banking Company, New York city, for $400, with interest from date at eight per cent. payable annually, for which five interest notes were stated to be attached to the main note. The consideration stated was value received; homestead was waived; and the note concluded as follows:

"Should any of said interest not be paid when due, it shall bear interest at the rate of 8 per cent. per annum from maturity, as stipulated in said interest notes; and upon failure to pay any of said interest within thirty days after due, said principal sum may, at the option of the holder of this note, be declared due without notice and may thereupon be collected at once, time being of the essence of this contract; and in case this note is collected by suit, I agree to pay all cost of collection, including ten per cent. of the principal and interest as attorneys' fees."

This was endorsed by Sherwood "without recourse."

Attached to the main note when made were five notes of like form, all dated November 16, 1883, and due on December 1, 1884, 1885, 1886, 1887 and 1888, respectively. Each of them stated that, for value received, the maker promised to pay to Sherwood or order the amount stated, at the office of the Corbin Banking Company, New York city, "being interest to that date" (the date of maturity) "on my note given to said payee." Each of them, except the first, added, "with interest from maturity at eight per cent.

per annum." In the note due December 1, 1884, this clause (according to copy annexed to the declaration) reads, "with interest from date at the rate of 8 per cent. per annum." The amount of this note is $33.24, that of the others being for $32 each; all except the last named were endorsed by Sherwood "without recourse." In copy no indorsement of the last appears.

The declaration alleged that, at the time when Merck executed and delivered the note to Sherwood, he also executed and delivered to him a deed to certain described land to secure a loan of $400, evidenced by the said note, and a bond to reconvey was given in conformity to sections 1969 and 1970 of the code; that on the same day, the note was transferred to the plaintiff and a deed made to it by Sherwood, and plaintiff is now the *bona fide* holder for value of the note and deed; that the interest note due December 1, 1884, was paid, cancelled and delivered to Merck, but the one due December 1, 1885, was not paid, and has remained due for more than thirty days; that Merck has failed and refused to pay it, and has thus violated his contract and failed to act in good faith, whereby the principal sum has become due; and plaintiff sues for the principal, with the interest due and to become due thereon, and also for the amount of the interest notes with interest thereon, and ten per cent. of such principal and interest as attorneys' fees. A general judgment on the notes and a special judgment against the land were prayed for. Service was acknowledged on July 20, 1886.

On February 23, 1887, the defendant filed the following pleas: The general issue; *nul tiel corporation;* that plaintiff was not the *bona fide* holder of the note and deed; usury, in that the main note with the interest notes attached (one of which latter notes bore interest from its date) were given to Sherwood for $400, and that sometime thereafter, the defendant received $310, the balance being reserved by Sherwood and his agents for interest, commissions, etc. ; that the $90 so reserved and the ten per cent.

attorneys' fees and the interest from date of the first interest note, were illegal, being charged in excess of the lawful rate of interest and to evade the usury laws; that the title conveyed was void because tainted with usury; and that there was a failure of consideration as to the $90 with accumulated interest thereon, and the ten per cent. attorneys' fees, they being without consideration and added in the notes to evade the laws against usury.

On motion, the plea of *nul tiel corporation* was stricken.

On the trial, the plaintiff put in evidence the note sued on, with the last four interest notes attached, the deed from Merck to Sherwood, and that made by Sherwood to it on the same day, which stated that the conveyance was made subject to the bond for title of Merck, and closed.

The defendant testified, in brief, as follows : He understood that R. P. Lattner, of Gainesville, was negotiating loans on land in Hall county, and went to see him for the purpose of obtaining money. Lattner said he could get it for defendant if the latter would give a mortgage on his land. He required defendant to sign an application for it, which is set out hereafter, and which was read over to him. About a week or so later, Lattner gave him a check for $310 and took the note and deed involved in this suit. At the same time, the defendant signed a receipt to the Corbin Banking Company for $400, which also is copied below. Is not positive whether he received $310 or $320. Made no complaint to Lattner that he did not receive all the money he was to get under the agreement. Supposes Lattner carried out his contract to the letter. Never saw Sherwood. Gave the deed to Lattner.

It was admitted that the presumption was that the coupon note not attached to the main note had been paid.

C. L. Holleman testified, in brief, as follows: Is engaged in negotiating loans. Works under no one, but obtains loans from any one he can. He and his brother were in business together in Gainesville. He came in about two years after the loan involved in suit was made, and knew

nothing concerning it when it was made. Directly after he began business in Gainesville, he and his brother were correspondents of Nelson & Barker, of Atlanta. The papers made out by them would be sent to Nelson & Barker and by them forwarded to some other place to get the money. Witness never was agent for the Corbin Banking Company for the purpose of loaning money or negotiating loans in this State. After the time of the loan to Merck, witness was a correspondent for that company. He asked to have business relations with them, so that they would recognize his applications. He would send applications for loans to them, and agreed to pay them ten per cent. for obtaining the loan, which was two-thirds of the charge made by him. He acted as the agent of the borrower and paid the company out of what the borrower paid him. He could not get money from local sources, and secured the assistance of the company for the purpose of calling the attention of lenders to these applications. An abstract of the title of the proposed borrower to the land offered as security had to be made out with applications for loans, the property had to be inspected, the records to be examined by witness, and missing links in the chain of title found; he paid his own expenses and charged the borrower for these services, and frequently they were worth more than the commissions. He was the head of his own business and charged what he pleased. The Corbin Banking Company furnished him with blank contracts, etc. to be signed. He did not negotiate loans according to their directions and instructions, but they would refuse applications not coming up to what they considered a proper standard, and witness knew what that standard was. Many of the applications forwarded failed to obtain the money. He paid the company for their services and received pay for his own. He was the principal in obtaining the money for the borrower. They could cease to do business with him, but could not discharge him; there was no contract between them, but a business arrangement to the effect

that, having confidence in him, they would attempt to ne-
gotiate loans upon such applications as he forwarded and
such as they saw fit to negotiate.   It was a business cour-
tesy to recognize witness as to applications, but there was
no agreement that they would recognize no one else; and
if another should prove himself more worthy of confi-
dence than witness, he could obtain money on an applica-
tion.   They do not appoint agents.   Witness knows noth-
ing of Sherwood and never acted as his agent directly or
indirectly.   Witness negotiated about fifty loans in Hall
and neighboring counties through the Corbin Banking ·
Company.   Some of them were made by several different
companies.    Many private individuals at the north make
such loans.

The plaintiff, in rebuttal, introduced L. B. Nelson, of Nel-
son & Barker, and W. G. Wheeler, of the Corbin Banking
Company, who testified, in brief, as follows : Nelson &
Barker were not agents for the Corbin Banking Company,
or for Sherwood or the plaintiff, but acted for themselves
and as agents of borrowers in securing loans   They had
no connection with Sherwood or the plaintiff or other
lenders, except to induce parties to make the loans.   They
made an arrangement with the Corbin Banking Company
to negotiate such loans as they should forward applica-
tions for from Georgia, as the company " saw fit."   Nelson
& Barker bore their own risks and paid their own ex-
penses.   They had to do certain things, make certain ex-
aminations and furnish abstracts of title—requirements
made by all loan brokers in Chicago, Boston and New
York.   That firm were not able to go directly to the men
who had large amounts of capital to loan, being unknown
to them, and therefore they paid the Corbin Banking Com-
pany ten per cent. for their assistance in getting the money,
and the company agreed to negotiate such loans as they
sent applications for; but the company were not responsi-
ble if they could not get the money, or the security did
not come up to the requirements.   Nelson & Barker paid

to have property inspected, whether loans were negotiated or refused. They sent applications to a number of others besides this company, and were under no obligations to it, nor it to them, except the moral obligation for it to negotiate such loans as it could. Hundreds of applications failed; some did not satisfy the necessary requirements, and on others they could not find the money. Sometimes for weeks Nelson & Barker could not get money at all. Nelson testified that he had been familiar with the banking company for twenty years, and had never known them to make a loan on real estate. For the purpose of assisting borrowers in obtaining loans, the company required an application setting forth the amount of the loan desired, the nature and character of the land offered as security, the crops grown on it, and other information necessary to enable them and those to whom they wished to apply for the money to ascertain the character of the security, and to enable the lender to determine whether or not he would make the loan. After receiving an application for a loan which seemed to the company to be a desirable one, they would look for some one who would probably lend the money, and if such a lender were found, they would cause a note and deed or mortgage to be prepared and executed, and an abstract of title to be made, if this had not already been done; and upon their receipt, they would be delivered to the lender and the money received from him and forwarded to the borrower or his agent, after deducting such amount as had been agreed to be paid for the services rendered. In 1882, Nelson & Barker appointed Lattner their correspondent in Hall county and the neighboring section of country to send applications for loans and to make out the necessary papers and forward them to that firm. They furnished him with a form of agreement and application. He was required to follow their directions as to applicacations, etc., but was not their agent or that of the lender, but was the agent of the borrower. The applications were submitted to the lenders themselves for acceptance or rejection.

Merck desired a loan, and on November 9, 1883, delivered to Lattner a written application without any address, describing the security offered and giving other information in answer to questions. At its close was the following clause:

"I understand that if this application is negotiated by R. P. Lattner, it will be upon the representations herein contained, which are true in all respects, and are made by me to be used by R. P. Lattner as my agent in procuring for me the loan."

This was signed by Merck. On the same day, he signed an agreement, which was addressed to Nelson & Barker, and contained the following provisions:

"I hereby constitute you my agents, and request and authorize you as such to negotiate for me a loan of four hundred dollars on five years' time, with interest at eight per cent. per annum, payable annually at such place as you may name." (Then follows an agreement to secure the loan by note and deed.) "I further agree to pay you for negotiating said loan a commission of eighty dollars, to be paid at the time of the closing of the loan, and if I decline to accept the loan for any reason, I agree to pay said commission at once." (After this follows an authority to pay off any liens on the property and to insure the house on it.) "If you succeed in negotiating this loan, I hereby authorize you to send the money draft or check (less the commission) to my agent, R. P. Lattner, of Gainesville, Georgia, and to make draft or check payable to his order."

These papers were sent by Lattner to Nelson & Barker, who forwarded the application to the Corbin Banking Company. They submitted it to Sherwood (who was a dealer in stocks, real estate and mortgage securities, residing in Queens county, New York, and having a place of business in New York city, and who was accepting applications for loans in the interest of the plaintiff), and induced him to accept it. The banking company then prepared a note and deed conforming to the requirements of the plaintiff and sent them to Nelson & Barker to be executed. Upon their return in proper form, with an abstract of title, they were delivered to the plaintiff, and the banking company received from it $400, which they forwarded to Nelson & Barker for Merck, first deducting the

amount agreed to be paid to them for their services in pro-
curing the loan.   Nelson & Barker sent to Lattner a check
on the Corbin Banking Company, and he in turn gave to
Merck a check on a bank in Gainesville for $320.   $80, or
twenty per cent. of the loan, was charged and deducted
before payment to Merck.   Of this, the Corbin Banking
Company received ten per cent., Nelson & Barker six per
cent. and Lattner four per cent.

On November 27, 1883, Merck gave the following re-
ceipt:

" Received from the Corbin Banking Company four hundred dol-
lars, proceeds of loan negotiated by them for me with J. K. O. Sher-
wood, less commissions as agreed."

Nelson testified that he did not know who would be the
lender until the papers were sent to him (meaning, prob-
ably, the notes and deed for Merck to execute, which were
prepared in New York and sent to Georgia for execution).

Wheeler testified that none of the money received by
the Corbin Banking Company for negotiating the loan
was paid to the plaintiff or to Sherwood, the plaintiff's
agent; that neither of them was interested directly or in-
directly in the Corbin Banking Company; that this com-
pany did not act as agent for either of them in this trans-
action; that $400 of the plaintiff's money was actually
paid over to the banking company for Merck under this
application; and that when the application was received,
he did not know from whom the loan would be procured.
This witness explained fully the system of business pursued
by his company in negotiating for and obtaining loans,
and the mode and means by which this particular loan was
procured.

The jury found for the plaintiff $400 principal, $19.36
interest, $43.13 attorneys' fees and costs.   The defendant
moved for a new trial on the following grounds, in sub-
stance:

(1)–(3) Because the verdict was contrary to law, evi-
dence and the weight of evidence, and without evidence
to support it.

(4) Because the court erred in the following charge to the jury: " Usury is the taking and receiving, or contracting to take and receive, more than the maximum per cent. allowed by law for the use of money "; and in refusing to give in charge §2051 of the code, defining usury directly or indirectly charged or reserved.

(5) Because the court refused to charge code, §§2057, (a), (b), (c), (d) and (f), forbidding more than eight per cent. interest to be charged or taken for the loan of money directly, or by way of commission, discount or any contrivance or device providing for forfeiture of excess, and declaring void titles made to secure usurious contracts.

(6) Because the court charged as follows: " If the evidence in this case shows to your satisfaction that the defendant, Mr. Merck, employed Messrs. Nelson & Barker and Mr. Lattner, as his agents, to negotiate a loan for four hundred dollars for him, and agreed to pay eighty dollars or any other sum for their services in making such negotiation, and did, upon their obtaining the loan for him, actually pay them out of the loan the amount he agreed to pay, the transaction would not be usurious, unless the defendant has gone further and shown by satisfactory evidence that Mr. Sherwood or the [plaintiff] received a portion of the commission."

(7) Because the court erred in the following charge: " If it has been proven that a considerable number of loans have been negotiated in this country through Messrs. Nelson & Barker and the Corbin Banking Company, of New York, the fact that a number of similar loans have been negotiated by these people has nothing to do with this case, nor do such facts authorize the jury to infer that this particular transaction is usurious."

(8) Because the court charged as follows: " Something has been said in this case about the amount of money paid over to the defendant by Lattner; that the defendant did not receive but three hundred and ten dollars. If the plaintiff paid the full sum of four hundred dollars to the

agent of the defendant for him, and such agent failed to pay over the full sum to him, the plaintiff could not be affected thereby ; the defendant in such case would have a right of action against his agent for such deficiency."— The error assigned was, that this charge " left out the question as to whether or not the same agent was also the agent of plaintiff; and the further question as to whether or not plaintiff had notice that said sum was to be reserved."

(9) Because the court charged as follows : " You have no right to disbelieve the testimony of any witness who has testified, unless the facts testified to by him have been disproved by other evidence, or he has been impeached in some of the methods provided by law. Witnesses can be impeached in only three ways: first, by disproving the facts testified to by them ; second, by proving contradictory statements made. by the witness on a material matter to the issue on trial ; third, by proof of general bad character."—The error assigned was, that the court did not further charge the jury that they had the right to take into consideration all they knew of their own knowledge of the witnesses, the manner of testifying, the relation they bore to the parties, and every other fact and circumstance connected with the case, in order to arrive at the truth.

(10) Because the court charged as follows: " The defendant, in addition to insisting that this contract is usurious, insists that the plaintiff is not entitled to recover attorneys' fees. On this subject, I charge you, while I think it is very foolish for a man to agree to pay his adversary's lawyers' fees suing him, still, when he contracts to do that, when he enters into a contract to pay attorneys' fees if he should be sued upon that contract, he is bound to abide by it ; it is valid and binding on the party."

(11) Because the court refused to charge as follows : "If the note sued on calls for ten per cent. attorneys' fees, then the same is non-negotiable, and the plaintiff would be affected with usury if, in fact, usury had been reserved or taken. And plaintiff could not claim to be an innocent purchaser without notice."

(12) Because the court refused to charge that the jury had the right to look to the time and place of the execution of the note sued on and the deed made to secure it, and all the circumstances connected therewith; and if they believed that Nelson & Barker and Lattner were the agents of the plaintiff in getting up and procuring the loans, or if the plaintiff or its agent, Sherwood, had notice of the commissions charged, then they would be affected with the usury in the transaction.

(13) Because the court charged as follows : " The defendant insists in this case that Lattner was the agent of the plaintiff, and the plaintiff insists that Lattner was Merck's agent. You have heard all the testimony, and you must determine from the testimony how that is. It is said that, in all cases in which the frauds and injuries of servants have been held to affect their employers, it appears that the employer afforded the means of committing the injury. · Defendant insists upon that proposition for the reason, he says, that Lattner was the plaintiff's agent; that he employed him to go and loan Merck the money. I charge you, when a person who negotiates a loan acts only as the agent of the borrower who has employed him and contracted with him to pay a stipulated price to secure a loan, the rule is different, and the lender, if he loans the money in good faith at a legal rate of interest, is not affected by the vice of usury. I think that in such case, as between the borrower and his agent, there is a substantive, independent contract, entirely different from any unlawful contract for money ; and to connect such contract with that loan would be to connect distinct and independent transactions with each other, and thereby make two contracts, each one of which may be fair and legal in itself, into one prohibited by law."

The presiding judge certified the grounds, stating, however, that no written request was made by defendant's counsel to charge on any part of the case.

The motion was overruled, and the defendant excepted.

Merck *vs.* The American Freehold Land Mortgage Co., of London, Limited.

J. M. Towery, for plaintiff in error, cited:

Definition of usury. Code, §2051.

Court should have charged code, §2057(a) *et seq.*, whether requested or not. 74 *Ga.* 825, 107; 70 *Id.* 825.

. Usury. Code, §2790; 39 Am. R. 69; 100 Ill. 611.

Theory of defence. 74 *Ga.* 317, 166; 67 *Id.* 228, 500; code, §2751.

Attorneys' fees 26 *Ga.* 403; 33 Am. R. 356; 40 *Id.* 781; 45 *Id.* 75; 84 Penn. 407; 92 *Id.* 227; 84 N. C. 24; 63 Mo. 33; 53 Wis. 599; 133 Mass. 151; code, §§2774 *et seq.*, 2244; 5 *Ga.* 163.

W. E. Simmons; G. H. Prior; N. J. Hammond, for defendant, cited:

Burden of proof on plea of usury. 96 U. S. 268; 21 N. J. Eq. 606, 438; 87 Ill. 513 (29 Am. R. 69).

Commissions of loan broker not usury, lender receiving none of them. 29 Am. R. 75, note; Dunlap's Paley's Agency, 306; 87 Ill. 513; 121 U. S. 105; 18 N. J. Eq. 481; 21 *Id.* 335; 116 U. S. 98; 4 Peters, 405; 21 N. Y, 219; 25 Iowa, 289; 31 N. J. Eq. 394; 30 *Id.* 543; 51 Iowa, 397 (31 Am. R. 397); 44 Iowa, 32; 46 *Id.* 46; Story Ag. §170; Tyler Usury, §156; 31 Conn. 81; 66 *Ga.* 638; 49 *Id.* 9.

Title to notes in plaintiff. Code, §2775.

Attorneys' fees legal, and do not make note non-negotiable. Code, §2774; 69 *Ga.* 587, 756; 71 *Id.* 287; 54 *Id.* 117; 53 Tex. 559; 30 Iowa, 131 (6 Am. R. 663); 3 Iowa, 244; 28 *Id.* 220; 29 *Id.* 120, 184.

Contract, where attorneys' fees indefinite. 92 Penn. 227; (37 Am. R. 675); 39 Mich. 137 (33 Am. R. 356); 53 Wis. 599 (40 Am. R. 781).

Verdict fully warranted; inaccuracy or omission not work reversal. 57 *Ga.* 443; 55 *Id.* 634.

Request covered by charge, 66 *Ga.* 446, 189.

Request in writing necessary. 69 *Ga.* 759.

BLECKLEY, Chief Justice.

1: All the notes were contracts to be performed in the city of New York. There is no evidence in the record as to the law there obtaining touching interest and usury. What restriction on the rate of interest, if any, prevails there does not appear. The argument here proceeded on the theory upon which the case was tried in the court below, namely, that the law of Georgia governs these contracts in all respects. In that view we acquiesced, without ruling for or against its correctness. Our law concerning interest and usury is found in the code from section 2050 to section 2057(g) inclusive. I copy therefrom all the provisions that we deem applicable to the case : "The legal rate of interest shall remain seven per cent. per annum, where the rate per cent. is not named in the contract, and any higher rate must be specified in writing, but in no event to exceed eight per cent. per annum. Usury is the reserving and taking, or contracting to reserve and take, either directly or by indirection, a greater sum for the use of money than the lawful interest. It shall not be lawful for any person, company or corporation to reserve, charge or take for any loan or advance of money . . . . any rate of interest greater than eight per cent. per annum, either directly or indirectly, by way of commission for advances, discount, exchange or by any contract or contrivance or device whatever. Any person, company or corporation violating the provisions of the foregoing section shall forfeit the excess of interest so charged or taken, or contracted to be reserved, charged or taken. All titles to property made as a part of an usurious contract or to evade the laws against usury are void."

Tried by these provisions, does the fact that Merck promised and paid $80 to procure the loan, taint it with usury ?

Nelson & Barker had a business establishment in Atlanta. Their business was to discover borrowers and lenders, procure for borrowers loans on landed security, verify

the security, and serve as a channel of communication and transmission between the contracting parties. They were middle-men stationed betwixt want and supply, and flanked on either side by other middle-men. One of these was Lattner, of Gainesville, in Hall county, who fronted, as it were, on borrowers, and another was the Corbin Banking Company of New York city, who fronted on lenders. Such was the line of intermediaries concerned in the present case. Merck, a farmer of Hall county, signed an application, not addressed to any one, for a loan of $400, and in the instrument designated Lattner as his agent. At the same time he signed another instrument, addressed to Nelson & Barker, in which he constituted them his agents to negotiate for the loan, agreed to pay them for negotiating it a commission of $80, and authorized them to retain the same out of the money in case of success. Both papers were sent to Nelson & Barker, and by them forwarded to the Corbin Banking Company. As the result of services rendered by the three intermediaries, who acted in concert on the basis of a business arrangement already existing, a lender was found, the loan was negotiated, the necessary papers were interchanged, and every dollar of the loan was paid to the Corbin Banking Company, and except the $80 retained as commissions, through it to Merck. His testimony raises in a dubious way some question as to a deficit of ten dollars, but there is little if any room to doubt that he received $320.00.

On the face of the papers, Sherwood was the lender; but from the testimony of Wheeler, a member of the Corbin Banking Company, it appears that the defendant in error (a London corporation) was the actual lender, and that Sherwood was the agent of the corporation, and its only agent who took any part in the transaction. He was not connected with the Corbin Banking Company, Nelson & Barker or, so far as appears, with Lattner, nor was the corporation he represented; neither did he or it receive or have any interest in any of the compensation retained by

Merck *vs.* The American Freehold Land Mortgage Co., of London, Limited.

the intermediaries, that being divided amongst themselves in the proportion of ten to the Corbin Banking Company, six to Nelson & Barker and four to Lattner.

Nelson & Barker, with whom the contract for compensation was made, were neither borrowers nor lenders; they were seekers after both, and had business relations with men, such as Lattner, to aid them in finding borrowers, and with other men or corporations, such as the Corbin Banking Company, to aid them in finding lenders. This was an independent business, established and carried on by Nelson & Barker, not in the interest of borrowers or lenders, but in their own interest. It was a lawful business, and they had as much right to pursue it for profit as a merchant or farmer or lawyer has to attend to his own lawful affairs for legitimate gain. It might be well to make it unlawful, but that is a question for the legislature. Neither the wide extent of it nor the amount of income derived from it would render it any the less a legal avocation. They could make what terms they pleased and burden whom they pleased with compliance. They could put the whole burden of their compensation on the borrower, the whole on the lender, or divide it between them, provided they did so by contract fairly made and faithfully observed. Moreover they could share their compensation with their business allies, those aiding them in rendering service, whether acting between themselves and borrowers, or between themselves and lenders, in any proportion mutually satisfactory. Were they to charge the lender twenty per cent. for finding a borrower, taking security and transacting the business, it would not reduce the loan. Nor would their charging the borrower that percentage for finding a lender, offering security and transacting the business, reduce it. The lender parts with as much of his money when the borrower pays some third person a commission on it, though it be paid out of the money derived from the loan, as when the borrower pays no commission. Doubtless, middlemen have a good business reason for charging

borrowers, rather than lenders, that reason being that borrowers will assent to their terms and comply with them, and lenders will do neither. But it is not the fault of lenders that borrowers will accept terms which they themselves would reject. Are lenders to blame that Nelson & Barker exact compensation from borrowers for their services, and that borrowers consent to pay and do pay what they exact? In this case, is the loan from the London corporation, through Sherwood to Merck, any the less untainted and incorrupt because Merck stipulated to pay and did pay Nelson & Barker for obtaining it? Neither Sherwood nor his principal was a party to that stipulation or had any interest in or concerning it. Then why should either of them suffer on account of it? It was a perfectly legal stipulation, and, for ought we can see, as pure on the part of Nelson & Barker as it was on the part of Merck. And if of doubtful purity on the part of either, or both, it was certainly spotless on the part of Sherwood and the corporation he represented. They did not advise, prompt or instigate it, and so far as appears, had not the slightest knowledge or intimation of its existence. But if they did know of it, how could that affect their rights? If it was a lawful stipulation as between the parties to it, how could it be unlawful as against those who were not parties? How could a loan procured as the result of lawful service, rendered under a lawful contract, become unlawful because of the lender's knowledge of such contract and service?

The only reply needed to the argument that the exorbitancy of the compensation is evidence that it was a device or contrivance for covering up usury, is, that the argument has no application to the facts; for it is not the lender or any one in privity with him who has received the compensation or shared in it. If the lender or his privies, under the name of commissions, wages for service or any other name, had received or retained anything, the argument would be in point. I will add, that though apparently very exorbitant, the compensation charged by

Nelson & Barker may not be excessive for the peculiar kind of business which they transact and procure to be transacted. The record does not throw much light on the question, as there was no evidence as to the actual value of the services rendered. But if Merck went in person for a loan of $400 either to London or New York, the chances are that he would not get it, and if he did the expense might not be less than $80. If he sought to obtain a loan by correspondence, his expenses would be light, and the loan too, in all human probability. The truth is, that a person, by enlisting others in his service, especially if they have superior knowledge, skill, standing, experience and influence, can often accomplish through them what no exertions of his own would ever achieve. From the unspeakable good down to the supposed good of procuring the temporary use of a little money, mediation is a means, not seldom the only means, of attainment. It was really for their experience and skill in finding money to loan on such security as he had, and for their business, influence and efficiency in obtaining, through their correspondents or allies, loans on that kind of security, that Merck employed them. Call their vocation what you will, say that it was lobbying the money market, still it was their regular business, and he desired and obtained their services in that business, agreed to their price and paid it. Whether it was extravagant and oppressive we know not, but the oppression, if any, was theirs, not that of Sherwood or the corporation which he represented. Where the lender of money neither takes nor contracts to take anything beyond lawful interest, the loan is not rendered usurious by what the borrower does in procuring the loan and using its proceeds. Thus, that the borrower contracts with one engaged in the intermediary business of procuring loans, to pay him out of the loan for his services, and does so pay him, will not infect the loan, the lender having no interest in such intermediary business or its proceeds.

2. It is insisted that these middle-men; all of them,

should be treated as agents of the lender. Implications of agency are easily over-strained, misapplied or otherwise abused. Here an express agency was created in behalf of the borrower, and the proof is plenary that the lender had no agent engaged in this transaction but Sherwood. It matters not how many agents appear on the scene if the lender has none or only one. If he holds control of his capital and decides for himself when he will part with it, and on what terms, and has no terms but lawful interest and good security, and satisfies himself that the security is good, he transacts his own business and is not to be judged by the law of agency. And if, doing none of these things in person, he commits them to a single agent, employed by him at his own expense, and this agent alone represents him, the principal and his agent are one, and the case is to be treated just as if the agent were the principal. Here, according to the evidence, and all the evidence, Sherwood was the agent and the sole agent of the lender. True, the notes and the deed were not delivered to him directly out of the hand of the borrower; true, he did not inspect the property or examine the title to see for himself whether the loan was secure; true, he did not deliver his bond to reconvey on payment of the debt, out of his own hand to the borrower in person, nor out of his own hand pay to him the money loaned; but deeds, bonds and promissory notes may be delivered to the absent and transmitted to any distance; money paid to any one accredited to receive it is well paid; and he who is satisfied with another's inspection of property or examination of titles does not render that other his agent by forbearing to inspect or examine for himself. Nelson & Barker doubtless secure confidence in the inspections and examinations which they make, procure or adopt, by demonstrating that they are worthy of confidence. Sherwood does not the less judge of the security by basing his judgment on the representation or opinion of whomsoever commands his confidence. No doubt he would be willing to trust the borrower's inspection and

examination if they were trustworthy and he knew it or believed it. Inspections and examinations which come with the endorsement of Nelson & Barker, may in his opinion be more reliable than if they were made by himself. It is obvious that the success of such business as Nelson & Barker were engaged in, must be staked on accuracy and reliability. But grant that the middle-men were by legal implication agents of both parties, the lender as well as the borrower, for several purposes, such as receiving and delivering papers, inspecting the property, examining the title, etc., it is certain, according to the evidence in the record, that they were not agents express or implied for making the loan, fixing the terms of it or accepting the security. Nor did they in fact do these things, but they were done by Sherwood. Now, unless some one who represented the lender in making the contract took or contracted to take for himself or the lender or some other person, something from the borrower over and above a legal rate of interest, how could the contract, under our code, be usurious ? It seems to us legally impossible that it could be. By using intermediaries as channels of transmission for papers, relying upon their inspection of property and examination of titles, made at the borrower's instance, and forwarding the money through them also at his instance, the lender does not constitute them his agents to make the loan, and is not chargeable with the consequences of dealings between them and the borrower, whether those dealings be public or private, known or unknown.

3. The question of interest on interest which the plea makes, that is, of interest on the first interest note from its date, was not decided or considered by this court. The declaration states that that note was paid, cancelled and surrendered to the maker. It is evident, therefore, the note was not before the pleader, yet what purports to be a copy of it is annexed to the declaration, and that copy not only omits the indorsement made by Sherwood, the payee,

but represents the note as bearing interest from date. The note given for the principal, on the contrary, represents all the interest notes as bearing interest from maturity. Going by the latter, which is in the brief of evidence (the former not being in the brief, and thus escaping our notice), we regarded the plea as to that point not proved. Some time after the judgment was made up and delivered, the oversight became known to us, but there was no reconsideration of the matter. As there was no allusion in the brief of counsel for the plaintiff in error to the point that the first interest note bore interest from date, we were authorized to conclude that he waived it, and that would justify us in not looking out of the brief of evidence for one of the facts tending to support the plea. The brief of counsel, as the rule of court requires, should always indicate the points relied upon.

That a stipulation for interest on interest overdue, or for reasonable counsel fees, is valid, has been so often ruled that we do not consider either of them an open question. It is lawful to contract for interest on interest overdue, and for payment by the debtor of reasonable attorneys' fees on sums, both principal and interest, which have to be collected by suit. That the first interest note was slightly larger in amount than the others, is explainable by its covering more time, by some days, than they did.

4. Any evidence, whether admissible or not, which the court excluded, could not and would not have changed the result. Nor could any modification of the charge of the court, whether by leaving out or putting in, have so done. The facts constrained a verdict for the plaintiff below, the controlling facts being that the lender parted with every dollar of the loan on faith of the borrower's contract expressed in the notes, and the security offered and given to secure performance, and was in no combination, league or confederacy with those who took the commissions, and they who took them did not represent the lender in loaning the money, fixing the terms of the loan or accepting

the security. Had the verdict not been for the plaintiff, a new trial would have been due as matter, not of discretion, but of right. It follows that, in our opinion, the grounds of the present motion are each and all insufficient, and that a new trial was properly denied. If any error was committed in the progress of the trial, it was harmless, for the verdict was correct.

. Though we have not quoted authorities, we have examined them to our satisfaction, and on the state of facts before us, most of them, we think, tend to sustain us. But we are to be understood as construing and applying the statutes of Georgia, and not as resting our decision upon what has been ruled touching the usury laws of other States. It is plain to every discriminating mind that any material difference either in the law or the facts will unfit one case for being an exact precedent for another.

. The calamities which a people may bring upon themselves by borrowing money too lavishly we recognize and deplore, but this shall not prevent us as a court from protecting lenders who violate no law. Were it our province to give advice to farmers, we should counsel them not to borrow; and certainly not through agents or loan agencies; but if they do borrow, even in that way, to abide by their contracts and comply with them, unless the fault by which they suffer is that of lenders and not their own. Better advice we could not give.

Judgment affirmed.