BROWN v. BROWN.

1. FINDINGS OF FACT—GIFTS.—Under the evidence in this case, *held*, approving the finding of the Circuit Court, that a tract of land, transferred by a father to his daughter's possession, was not a gift, but was only intended to be given at some future day ; and that such intention not having been carried out, the gift never took effect.

2. USURY—OUTSIDE SERVICES.—A charge of interest in excess of the legal rate, for the use of money, is usury ; additional compensation for services rendered, not embraced in the charge for the use of the money, is not within the inhibition of the usury laws.

3. IBID.—AGENT—KNOWLEDGE BY PRINCIPAL.—Where a mortgage corporation makes a loan of money through its agents to a borrower, who, in a written application, declares the sub-agent of the mortgagees to be the agent of the borrower, and agrees to pay such sub-agent twenty per cent. of the amount borrowed for his services and the services of those whom he employs to assist him in negotiating the loan, and the lender knows of this

exaction, the loan is usurious, whether the lender participated in this charge or not. Mr. Chief Justice McIver *dissenting.*

4. Ibid.—Ibid.—Ratification.—And a part of this loan having been retained by this sub-agent as agent of the mortgagees, and with their approval, to await the settlement of an outstanding disputed encumbrance, the borrower is not liable for more than the amount actually received by him, without interest or costs.

Before Norton, J., Florence, October, 1891.

This was an action by William E. Brown and James Brown, as executors, against Louisa A. Brown and others. So much of the Circuit decree as recited the facts, and passed upon the parol gifts, is stated in the opinion; so much as related to the question of usury was as follows:

The Am. F. L. Mort. Co., $7,500 and int. at 8 per cent. on its mortgage, dated June 28th, '87. They admit that Mr. Brown never received a cent in person; that W. H. Duncan paid on mortgages and judgments for him $4,199.04; paid $3.50 to clerk, it is supposed for recording mortgage, retained fee of $25, expenses $25, and $1,500 commissions. From the $1,737.46, principal remaining, Duncan paid to Corbin Banking Company $253.85, the first interest coupon, leaving in his own hands $1,483.13. It will thus be seen Brown had the benefit of $4,199.04. The mortgagees attempt to sustain this transaction by production of the printed contract made by Brown with Duncan, dated January 19th, '87, in which Brown appoints Duncan his agent to negotiate a loan of $7,500, and agrees to pay him and his agents 20 per cent. for procuring it within thirty days for him, the mortgage of Brown, dated June 28th, '87, and his printed receipt to the Corbin Banking Company. The executors allege partial failure of consideration and usury.

Now, if Duncan and the Corbin Banking Company were even the special agents of the lenders for this particular transaction, and contracted with their knowledge to receive a commission of $1,500 for a loan of $7,500, the contract would be usurious. *Nichols* v. *Osborne,* 3 Cen. Rep. N. J., 466; *Payne* v. *Newcomb,* 39 Am. Rep., 69; 100 Ill., 6; *Brigham* v. *Myers,* 33 Am. Rep., 140; 51 Iowa, 397; *Call* v. *Palmer,* 116 U. S., 98;

*Borcherling's Ex'rs* v, *Trips,* 4 Cen. Rep., 337 (N. J.); *Dendrist* v. *Van Denberg,* 3 *Id.,* 90; note to *Davis* v. *Gross,* 55 Am. Dec., 295, and cases there cited. If Duncan and the Corbin Banking Company were the general loan agents of the mortgagees, then knowledge by the mortgagees of the usurious exaction will be presumed, and the lenders would have to rebut this presumption by affirmative proof, in order to escape. Aside from the presumption, the evidence convinces me that Duncan and the Corbin Banking Company were the general loan agents of the mortgagees, and that they had actual knowledge of the usurious exaction, and participated therein. If, therefore, the negotiation and agreement for this loan had been finished and the transaction completed, the counter-claim of the executors would have to be allowed to the extent of double the bonus which was to be reserved. *Banks* v. *Flint,* 16 S. C. (Ark.), 477; *Pfenning* v. *Scholer,* 10 Atl. Rep., 833 (N. J.); *Banks* v. *Flint,* 14 S. W. Rep., 769 (Ark.); *Sherwood* v. *Roundtree,* 32 Fed. Rep., 113.

But the contract of which the mortgage formed a part was not only usurious in its inception, but it was incomplete and unfinished at the time of Brown's death. The money was placed in the hands of Duncan by the lenders, to be paid to Brown whenever in his judgment the land was sufficiently cleared of incumbrances to justify him in doing so. Duncan paid out $4,199.04, and retained all the remainder of the $6,000, and while the title was still unsatisfactory to him, Brown died. Not only did Duncan retain the money as the agent of the mortgagees, but they have since ratified his course in doing so. The transaction having been broken off incomplete by Brown's death, the mortgagees can only recover the actual amount paid on the mortgage, and they cannot recover interest on this sum, because the original contract under which they made the payment, as we have seen, was usurious. The Am. F. L. M. Co. is, therefore, entitled to be paid $4,199.04, $3.50 paid for recording mortgage, $25 fee for abstract of title, and $25 traveling expenses in the effort to clear the title, aggregating $4,252.54, without interest or costs.

*Messrs. Johnson & Johnson,* for the Bowens, appellants.

*Messrs. Allen J. Green* and *John T. Sloan, Jr.,* for A. F. L. M. Co., appellant.

*Mr. C. A. Woods,* for respondent.

April 19, 1893.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   John A. Brown departed this life in August, 1887, leaving a large body of lands, portions of which were heavily incumbered.   A short time before his death, he made a will, the validity of which was contested by his daughter, Mary R. Brown, on the ground of incapacity at the time of its execution; but the will was established.   All the said estate was devised to his two sons, James H. Brown and William E. Brown, in trust, to be managed and rented by them, and the rent applied to the payment of debts, giving them power to sell any or all of the lands for payment of debts, if the rents should not be sufficient for that purpose within a reasonable time.   After the payment of debts, the trustees were directed to convey two certain tracts of land to Mrs. Bowen and Mrs. Clayton, respectively, two daughters of the testator; the remainder of the lands the trustees were directed to divide into four equal portions, conveying to James H. Brown, William E. Brown, and Walter F. Brown, each one portion, and to Louisa A. Brown and Margaret A. Brown, each one-half of the remaining shares.   These devises were to the testator's children for life, and to the heirs of their bodies, respectively.   The personal property was devised to Louisa A. Brown and Margaret A. Brown, &c.   James H. Brown and William E. Brown were also appointed executors.   At the time the will was executed, the testator made a deed, by which, in consideration of love and affection, he conveyed to his daughters, Louisa A. Brown and Margaret A. Brown, the homestead tract of land, and the McKissick tract adjoining, &c.

The estate was found to be largely in debt, the creditors being very pressing; and the executors, finding it impossible to carry out the scheme of the will, commenced this action to enjoin creditors from suing at law, to call them in to prove

REP.]                April Term, 1892.

their claims, for account, and the sale of lands for the payment of debts, &c. Mrs. Bowen and Mrs. Clayton answered the complaint, claiming parol gifts from the testator of the lands devised to them, and alleging the deed to Margaret A. Brown and Louisa A. Brown to be invalid, because of the incapacity of the testator. Mrs. Clayton, however, abandoned this last position at the trial. An order was made in the cause, enjoining creditors from suing at law, requiring them to present and prove their claims before the master, and directing the master to take the testimony and report the same to the court. There was no objection made to any of the claims presented except a mortgage debt of the "American Freehold Land Mortgage Company of London," for $7,500, and interest thereon.

The only two issues in the case are: (1) Are Mrs. Clayton and Mrs. Bowen entitled to hold the lands in their possession by parol gift? If not, are they entitled to compensation for improvements alleged to have been made on those lands? (2) To what extent is the mortgage of the American Freehold Land Mortgage Company a valid claim against the estate?

*First.* As to the claim of parol gift of lands to Mrs. Bowen and Mrs. Clayton, daughters of the testator. The master took and reported the testimony, which is all printed in the Brief. It seems that the testator, in his lifetime, placed his two daughters, viz., Mrs. Bowen and Mrs. Clayton, each on a particular tract of land, and at times was heard to say that he intended to make a gift to each one of the particular tract of land occupied by her; that he was often asked by Mrs. Bowen to make titles, but being embarrassed, he declined to do so; and up to the time when he made his will, he certainly did not understand that he had given titles to the lands, for he disposed of them by his will. We think the Circuit Judge substantially stated the evidence as follows: "The gifts are alleged to have been made in November, 1878, yet rent notes were given by Mrs. Bowen and Mrs. Clayton in December, 1878, and January, 1879, at the time they entered into actual possession, and Mrs. Bowen's rent note was for the identical land claimed now as a gift. All of Brown's children, without compulsion, signed an acknowledgment of tenancy in 1883, and this paper was

12—38

exhibited to the agent of the mortgagees aforesaid at the time the mortgage hereafter mentioned was given to the Am. F. L. M. Company. It was clearly understood by all the family that Brown, the testator, held the title and the control of all his lands until such time as he thought expedient to make gifts to his children. A future intention on his part and an expectation on their part, cannot be converted into a gift. Removals were made by Brown of Mrs. Clayton and William E. Brown from one tract to another, and the lines of the tract claimed by Mrs. Bowen were surveyed and changed, against Brown's protest. No witness is produced to the alleged gifts, and there is no proof of time, place, or circumstance of such gifts. Clayton paid $500, his wife's proportion of the debts, in order to get title, but this alleged contract was cancelled, and Brown actually repaid him the money. The lands were always returned for taxes by Brown, and he paid the taxes as long as he lived, and his executors after his death," &c. The judge found and held, that "the alleged parol gift has not been established."

To this decree A. H. Brown excepted, because the judge "did not dismiss the complaint as to him with costs, as demanded in his answer." And Mary A. Bowen and her children excepted to the same on several grounds, which are printed in the Brief.

We think that a careful reading of the testimony will show that Mrs. Bowen was put into possession of a tract of land by her father, the testator, with the expectation of making titles to her for it at some future-day, if, as he hoped, he could relieve himself from his debts, which were pressing, but which, as it turned out, he was never able to accomplish. This is shown by "Exhibit A," dated June 9, 1883, as follows: "We, the undersigned, heirs at law of John A. Brown, do hereby make a free acknowledgment that we are tenants at will of the said John A. Brown, holding over, and have no legal right to the land we live on, known as the Crawford and Thomson lands, and never was so understood by us. In testimony whereof, we have hereunto affixed our hands and seals.

(Signed)          M. A. BOWEN.          [L. S.]
                  J. H. BROWN.          [L. S.]
                  WALTER F. BROWN.  [L. S.]

"I do voluntarily waive all rights as above specified, so far as the land I live upon, and any other my father owns.

(Signed) LIZZIE CLAYTON. [L. S.]"

James M. Brown testified that he was present when Mrs. Bowen signed it. "She seemed unwilling to sign at first, but I read it over to her several times, and explained it—that we all expected to sign it (I had already signed)—that it would not injure us at all—that father owned the land, and it would (not) prevent him from carrying out his purpose of giving us the land at some future day. He (father) spoke up, and said he did not consider any of us as owning the land, or having any claim on it, but the men he was negotiating the loan with, required the paper of him. She then signed it," &c. Mrs. Bowen was one of the married daughters of the testator, who put her into possession of one of his tracts of land, without making any charge of rent, with the hope of being able to pay off his debts and make her title to the same, but before that was done he died, disposing of the lands by will. "An expectation on one part and intention on the other, will never constitute a binding contract." *Ex parte Aycock*, 34 S. C., 255. "Improvements and use are not evidence of gift from parent to child. The family relation is sufficient to explain it." *Cox* v. *Cox*, 26 Penn., 375; s. c. 67 Am. Dec., 436. "One who enters as a tenant of the owner is not presumed to hold adversely, even after his term has expired. In all such cases, if there is a relation adequate to account for the possession, the law accounts for it by that law, unless the contrary is proved." *Hertzog* v. *Hertzog*, 29 Penn., 465. We agree with the Circuit Judge, that "the alleged parol gifts of the lands were not established."

*Second.* Under a call for creditors to present and prove their demands before the master, "The American Freehold Land Mortgage Company of London, Limited," presented the notes of the intestate, John A. Brown, for $7,500, with interest at eight per cent. per annum, secured by a mortgage of a part of his lands, carefully described in the mortgage, bearing date June 28, 1887. The executors interposed the defences of usury and partial failure of consideration. Without going into the testimony in detail, we think it sufficiently appears that W. H.

Duncan, a lawyer of Barnwell, was engaged in the business of negotiating loans of money on mortgages of real estate; and the intestate Brown, having large bodies of land, and being much embarrassed, applied to him (Duncan), through his sub-agent Johnson, to procure for him a loan of money. Brown filed the usual written or printed application, appointing Duncan his agent for that purpose, undertaking to pay him twenty per cent. for services, and the services of those who assisted him, in case of success; and that the loan should be based upon the statements of the application, which are true in all respects, &c. Duncan forwarded the papers to "The Corbin Banking Company" of New York, and after considerable delay the loan was negotiated with the appellants, the aforesaid London Company. Brown, anxious to realize the loan, signed the notes and mortgage and receipted for the money, which it seems was paid over to Duncan, as Brown's agent. Duncan paid, with a part of the money, some outstanding encumbrances on the mortgaged premises, and pending the removal of certain other alleged liens on the property, Brown departed this life; leaving in the hands of Duncan $1,494, which Duncan still holds, never having paid it over, for the reason, that he had notice from some persons claiming to be interested therein, not to do so.

Under this state of facts, his honor, Judge Norton, held that the loan was usurious, and allowed the mortgagees to have judgment only for the money actually paid by Duncan for Brown's use, without interest. That Duncan retained the money as the agent of the mortgagees, and that they have since ratified his course in doing so. From this decree the mortgagees appeal to this court, charging error as follows:

(1) In holding, "If Duncan and the Corbin Banking Company were even the special agents of the lenders for this particular transaction, and contracted, with their knowledge, to receive a commission of $1,500 for a loan of $7,500, the contract would be usurious."

(2) In holding, "If Duncan and the Corbin Banking Company were the general loan agents of the mortgagees, then knowledge by the mortgagees of the usurious exaction will be

presumed, and the lenders would have to rebut the presumption by affirmative proof, in order to escape.''

(3) In holding, that, aside from the presumption, the evidence was sufficient to establish ''that Duncan and the Corbin Banking Company were the general loan agents of the mortgagees, and that they had actual knowledge of the usurious exaction, and participated therein.''

(4) In finding, ''Not only did Duncan retain the money as agent of the mortgagees, but they have since ratified his course in doing so.''

(6) In not holding, that ''the mortgage of the appellants is legal on its face, and when usury is alleged, the burden of proof is on him who alleges it to show it; and he must show it by a preponderance of the evidence—the law never presumes an instrument, legal on its face, to be illegal.''

(7) In not holding, as a matter of fact, ''That the evidence shows that Duncan and the Corbin Banking Company were the agents of Brown, the borrower; and the mortgagees had no privity with them in the transaction, and did not participate in the commissions.''

(8) In not holding, that there was no evidence to show that the mortgagees in any manner participated in, or derived any benefit from, the commission of $1,500 paid Duncan by Brown.

(8a) In not holding, that there was no evidence, or not sufficient evidence, to show that the mortgagees had any knowledge of the commission paid by Brown.

(9) In not holding, as matter of law, that the test of usury is, whether the lender, directly or indirectly, receives for the use of his money an amount greater than the law allows; and it can make no difference what amount of commissions the borrower pays middlemen, or even the lenders' agents, to negotiate the loan, if the lender received no part of it.

(10) In not holding, from the evidence, that Duncan was the duly authorized agent of Brown to receive the loan, and the payment of the whole amount of the loan to him by the mortgagees was the payment to Brown, &c.

We agree that the purpose of the usury law is to prevent the lender from charging, taking, or allowing upon any con-

tract for the hiring, lending, or use of money, more than the per centum allowed by law.   The terms of the act show that the law-makers had in contemplation a direct contract between the lender and the borrower, and the offence denounced is against the lender for the taking or "allowing" of a greater rate of interest than the law allows. It seems that to constitute usury, the charge in excess of the legal interest must be for the use of the money.   Hence a cotton factor, whose principal business is to sell cotton, may lend money, charging full interest therefor, and, at the same time, charge the borrower "a commission" for work done, or to be done, outside of the money transaction, such as the selling of cotton, &c., without making the transaction usurious.   *Norwood & Co.* v. *Faulkner*, 22 S. C., 367.   I suppose, also, that one who negotiates a loan of money may properly be allowed reasonable compensation for his expenses and trouble, in addition to interest.

The $1,500 charged in this case were called "commissions," but it is difficult to understand for what they could be charged as such, unless it was for services and influence in securing the loan.   That it was for such services, would seem to be indicated by the fact that the sum charged was measured by the amount of the loan to be secured—that is to say, twenty per cent. thereon. Now, if the lender and borrower had negotiated this transaction face to face, and the lender had exacted this $1,500 in addition to the bond and mortgage, which were for full interest, and fair upon their face, we take it that it would have been usurious, for it would have been paid to obtain the loan, or, in other words, for the use of the money, and such would have been the result even if the lender had directed the money paid over to another person or their agent, retaining nothing whatever for themselves but the legal discount.   *Meagoe* v. *Simmons*, 1 Moody & M., 121.

But the matter is a good deal complicated by the necessity for, and the employment of, intermediaries.   Those who proposed to lend money on the security of land and mortgages of land, lived in London, England, and the person wishing to borrow lived in South Carolina.   They knew

nothing of each other, and to accomplish their common purpose it was necessary to have the services of middlemen. Duncan lived in Barnwell, near Brown, who wished to borrow money, and through him he was placed in communication with the "Corbin Banking Company of New York," who, it seems, were engaged in the business of placing loans for other parties. When Brown made his formal application for the loan, upon a printed form furnished him, he stipulated as follows: "Now, then, if he (Duncan) shall succeed in negotiating said loan within thirty days, upon the usual conditions exacted by eastern money lenders as to security, perfecting of title, insurance, &c., I agree to pay the said W. H. Duncan the sum of $1,500, which shall be in full of his commissions and the commissions of those whom he employs to assist him in making said negotiation," &c. It will be observed that it is not expressly stated to whom the $1,500 was to go, except to Duncan, "in full of his commissions and the commissions of those whom he should employ to assist him in making the negotiation." There is no stipulation that any part of it should go to those who actually furnished the money. Nothing seems to have been charged against them for the services rendered in looking after the title to the lands mortgaged, interest, &c.

The above agreement was a part of the original application for the loan, which was forwarded and accepted, and the papers drawn in accordance with it were sent back and signed. Now, the question is, did this contract to pay the $1,500 make the loan usurious as to the mortgagees, who were the actual lenders? The decisions on the general subject are not at all in accord; but, without attempting to review and reconcile the numerous cases cited, we think the weight of authority makes that depend upon the question of fact, whether the contract to pay an excessive and unreasonable amount, such as what is here called "commissions," to the middlemen (no matter by whom made), was known to those who furnished the money upon it. If they knew the facts when the proposition was made and accepted, the loan will be held to be usurious. See the authorities. *Nichols* v. *Osborne*, 3 Cent. Rep. (N. J.), 466; *Payne* v. *Newcomb*, 100 Ill., 611; s. c. 39 Am. Rep., 69; *Brigham* v. *Myers*, 51 Iowa,

397; s. c. 35 Am. Rep., 140; *Call* v. *Palmer*, 116 U. S., 98; *Borcherling's Ex'ors* v. *Trefz*, 4 Cent. Rep., 337 (N. J.); *Desnoast* v. *Van Denbery*, 3 *Id.*, 90; 55 Am. Dec., 395, and cases there cited; *Boyd* v. *Engelbrecht*, 36 N. J. Eq., 612; *Sherwood* v. *Roundtree*, 32 Fed. Rep., 120, &c.

No denial is made in this case that the mortgagees had knowledge of the contract as to the taking of the $1,500. Duncan, the agent, does not state who besides himself was to participate in it. The Circuit Judge found that, "Aside from the presumption, the evidence convinces me that Duncan and the Corbin Banking Company were the general loan agents of the mortgagees, and that they had actual knowledge of the usurious exaction, and participated therein." Whether the mortgagees did or did not derive benefit, directly or indirectly, from the $1,500, which was not a reasonable or proper charge for any services rendered, we cannot doubt that they had knowledge that such contract had been made, when they accepted the terms proposed, and remitted the money.

Besides, the Circuit Judge held that the contract was incomplete and unfinished at the time of Brown's death. The money was placed in the hands of Duncan by the lenders, to be paid to Brown, when, in his judgment, the land was sufficiently cleared of incumbrances to justify him in doing so. Duncan paid out $4,191.04, and retained all the remainder of the $6,000; and while the title was still unsatisfactory to him, Brown died. Not only did Duncan retain the money as the agent of the mortgagees, but they have ratified his course in doing so. The transaction having been broken off by Brown's death, the mortgagees can only recover the actual amount paid upon the mortgage, the aggregate amount being $4,252.54, without interest or costs.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE POPE concurred.

MR. CHIEF JUSTICE MCIVER, *dissenting.* While I concur in all other respects in the opinion prepared by Mr. Justice McGowan, I can not agree with him in sustaining the plea of

usury set up by the executors against the claim presented by the American Freehold Land Mortgage Company of London against the estate of the testator, John A. Brown. That claim is based upon a note, secured by a mortgage, executed on the 28th day of June, 1887, whereby the said John A. Brown promised to pay to the said Mortgage Company the sum of seventy-five hundred dollars, on the 28th of June, 1892, with interest from date at the rate of eight per cent. per annum. Under the law as it is stood at the time of the execution of this contract, parties might lawfully contract in writing for the payment of interest at any rate they might agree upon, provided such rate did not exceed ten per cent. per annum. Act of 1882, 18 Stat., 35. It is is obvious, therefore, that this contract does not, on its face, show any taint of usury; and, on the contrary, the parties might have lawfully contracted for interest at the rate of ten instead of eight per cent. But while this is so, yet it does not follow necessarily that there was no usury in the transaction; for if the borrower can show that, notwithstanding the fact that the contract on its face shows no usury, yet, as a matter of fact, there was usury in the transaction, he is at liberty to do so; the burden of proving that is, however, upon the borrower. Usury is an affirmative defence, which must be pleaded and proved by the party seeking to avail himself of such defence. *Ex parte Monteith*,. 1 S. C., 227. The question, therefore, is whether respondents have succeeded in proving that there was usury in this transaction.

Without undertaking to question any of the findings of fact by the Circuit Judge (although some of them, perhaps, may be open to objection), or to enter into any consideration of the testimony in the case, it seems to me that the real question in the case is, does the mere fact that the lender knows, when he advances the money, that the borrower had contracted to pay, out of the sum loaned, an intermediary employed to negotiate the loan an exorbitant charge for commissions, in any way affect the lender, so as to taint the contract with usury, unless the lender was induced to make the loan by participating in, or expecting to participate in, the benefits to be derived from such charge of commissions? Upon this question we have no

authority in this State, so far as I am informed, and the au-
thorities elsewhere are directly conflicting, being, as I think,
pretty evenly divided, so that this court is free to decide be-
tween these conflicting views.   Without burdening this opinion
with any review of the cases cited to sustain one side or the
other of this question, all of which I have carefully examined,
I will content myself with saying, that I am decidedly of opinion
that those cases which hold that mere knowledge on the part
of the lender that the borrower has contracted to pay the
intermediary employed to negotiate the loan an exorbitant
charge for his services, and the services of those whom he may
employ, cannot and ought not to affect the lender, unless it is
shown that he either participated in, or expected to participate
in, the benefits to be derived from such charge.   It seems to
me that the true rule upon the subject is no where better stated
than by Bleckley, chief justice, in the case of *Merck* v. *Ameri-
can Freehold Land Mortgage Company*, 79 Ga., 213, reported,
also, in 7 S. E. Rep., 265, in these words: "Where the lender
of money neither takes, nor contracts to take, anything beyond
lawful interest, the loan is not rendered usurious by what the
borrower does in procuring the loan and using its proceeds.
Thus, that the borrower contracts with one engaged in the in-
termediary business (of) procuring loans, to pay him out of
the loan for his services, and does so pay him, will not infect
the loan, the lender having no interest in such intermediary
business of its proceeds."

I suppose that in most cases a person desiring to borrow
money, in order to effect his object, is compelled to incur some
expense, either directly or by the employment of an agent; and
what possible concern the lender can have in the expenses
which the borrower may see fit to incur in obtaining the money
which he wishes to borrow, I am unable to conceive.   A person
having money to lend is only bound to see to it that his contract
is within the law, and is under no obligation whatever to con-
cern himself with a contract which the borrower chooses to
make with a third person, in which the lender has no interest.
If a person residing in the country desires to borrow money
from another person residing in a distant city, and instead of

negotiating the loan himself, chooses to employ an agent to visit the city for the purpose, the fact that the lender knows that the borrower has paid, or has contracted to pay, such agent not only his actual expenses, but also an exorbitant charge for his skill and services in negotiating the loan, cannot affect the lender, who has nothing in the world to do with any agreement between the borrower and intermediary agent as to the compensation which the latter is to receive. It is none of the business of the lender, and he has no right to interfere with or concern himself about it. If, then, the lender has no right to dictate or control the terms of an agreement between the intermediary agent and the borrower for the compensation of the former, I do not see upon what principle of law or justice the lender can be held responsible for, or be affected by, such agreement. Nor do I see how the fact that the intermediary agent employed by the borrower to negotiate the loan is also the agent of the lender, either special or general, can affect the question. Even when that is so, the fact still remains that the money which the borrower pays, or contracts to pay, to the intermediary, is not paid "for the hiring, lending, or use of money or other commodity," but is paid for the services of the intermediary—a totally different thing.

But what is more important, is that this defence of usury rests solely upon statute, and cannot be sustained until it is shown that the provisions of the statute have been violated. The first section of the act of 1882, above cited, provides that: "No greater rate of interest than seven (7) per centum per annum shall be charged, taken. agreed upon or allowed * * * for the hiring, lending or use of money or other commodity, except upon written contracts, wherein, by express agreement, a rate of interest not exceeding ten per cent. may be charged. No person * * * lending or advancing money or other commodity upon a greater rate of interest shall be allowed to recover any portion of the interest so unlawfully charged," &c. Now, until it is shown that the lender has either "charged, taken, agreed upon or allowed" a greater rate of interest than the statute prescribed, it is very clear that there has been no violation of the statute; and until it appears that the person lending

or advancing the money has charged a greater rate of interest than that allowed by the statute, such person does not forfeit his right to recover any interest. The fact that the borrower has paid, or contracted to pay, *some one else* an amount, however exorbitant, *not* for the "hiring, lending or use of money," but for the services of such person in negotiating the loan, cannot possibly affect the question, for that does not come within the terms of the statute.

Even assuming, therefore, that the Mortgage Company well understood, at the time they advanced the money, that the borrower was under a contract to pay Duncan out of the money his exorbitant charge as commissions for his services and the services of those whom he employed, I am unable to perceive upon what principle that could affect the contract between Brown and the Mortgage Company, for there is not the slightest testimony, so far as I can see, that the Mortgage Company either received, or expected to receive, any portion of the amount which Brown had agreed to pay Duncan for his services. All that the company contracted for, and all that it has ever demanded, is lawful interest.

I need not go into any consideration of the amount which should have been allowed, as my main object is to put on record my decided objection to the doctrine that mere knowledge on the part of the Mortgage Company of the contract between Brown and Duncan is sufficient to infect the claim of the Mortgage Company with usury.

Judgment affirmed.