## McLEAN *v.* CAMAK.

1. Although the maximum legal rate of interest was reserved upon a given loan, the mere fact that the lender's agent charged the borrower an additional sum as a commission for making the loan, did not render the transaction usurious as to the lender, when he did not authorize such charge, had no knowledge of the same, and did not share in the commission.

2. In determining whether or not, as matter of fact, the lender had knowledge of the agreement between his agent and the borrower for the payment of such commission, the law of implied, as well as of express, notice may be invoked; but the agent's own knowledge of the fact that he did charge the commission, uncommunicated to his principal, is not imputable to the latter, the doctrine of constructive notice not being pertinent to the inquiry.

February 29, 1896.

Complaint for land. Before Judge Callaway. McDuffie superior court. January term, 1895.

*I. E. Farmer* and *P. B. Johnson*, for plaintiff in error.
*John T. West*, contra.

Lumpkin, Justice.

This was an action for land, in which the plaintiff below, Mrs. Camak, relied for a recovery upon a deed to herself from the defendant, Mrs. McLean. The latter set up as a defense, that this deed was given to secure the payment of a promissory note which was usurious, and that therefore the deed was void because tainted with usury. The material facts, as shown by the evidence, are as follows:

Mrs. Camak made a loan of money to Mrs. McLean, who thereupon executed and delivered the note and deed in question. The transaction was not conducted by Mrs. Camak in person, but through Mr. Thos. E. Watson, her agent. The note bore interest at the rate of 8 per cent. *per annum.* The agent charged Mrs. McLean a commission for making the loan, which she paid to him out of the proceeds thereof. As to the scope and character of his agency, Mr. Watson testified: "I looked after her business in this county, and she requested me to make investments for her out of money collected from her father's estate. I am not sure whether I consulted Mrs. Camak about making this particular loan or not. . . Mrs. Camak did not receive any" of the commission charged for making the loan, "nor did I notify her that I charged a commission, and she had no notice of it, so far as I know. She did not pay me anything for making the loan, nor did she agree to pay anything. . . I had a good deal of money to collect for Mrs. Camak and her sister, Mrs. DuBose, which was due them as heirs of Judge Wellborn, and I charged them for collections I made. I am not certain I had enough of Mrs. Camak's money to pay Mrs. McLean the full amount of loan at time it was made; if not, I soon collected it for her. I am not certain that I notified Mrs. Camak at the time that I had made this loan; but if not, I informed her soon after-

wards." In a letter introduced by the defense, addressed to Mrs. McLean in regard to this loan, Mrs. Camak said: "Several years ago, I asked Mr. Watson to make investments for me with the collections he made from my father's estate, and trusted him entirely to do so without any consultation with me. Consequently, I did not know he had made any business relations with you until some time afterward." And in a subsequent letter she wrote: "You know you made the bargain with him, and it was a good while before I knew anything about it."

The defendant introduced no evidence whatever tending to show that Mrs. Camak ever authorized her agent to receive commissions on loans negotiated in her behalf, or knew that it was his custom to charge commissions, or had ever shared in the same, or otherwise ratified the acts of her agent in thus transacting her business.

1. From the foregoing statement of facts, it cannot be doubted that Mr. Watson was a general, and not a special, agent. As such he had ample authority to bind the plaintiff by any act on his part which properly and legitimately appertained to a lawful transaction of business entrusted to his care. It is proper to observe, however, that his authority as a general agent did not extend to making in her behalf contracts which the law expressly prohibited. Therefore, in the absence of some authority outside of, and in addition to, that conferred by the general agency, he had no power to make for her a contract tainted with usury. The transaction involved in this case was unquestionably of this character; so it becomes important to inquire whether the agent undertook to act under the general powers with which he was clothed in his capacity of general agent, or by virtue of even more comprehensive authority expressly conferred upon him by his principal.

"The general rule is now well settled, that commissions paid or agreed to be paid by the borrower to an agent of the lender for his services in procuring or advising the loan,

and which, if added to the stipulated interest, would exceed the statutory limit, do not render the contract of the loan usurious, provided that such commissions are not in any manner shared in by the lender and are not exorbitant or unreasonable in amount; or, if excessive, that they were exacted by the agent without the lender's knowledge or consent." 27 Am. & Eng. Enc. of Law, p. 1004.

In the present case, it is to be observed that the note and deed are apparently perfectly valid, as they contain nothing to indicate that a higher rate of interest than 8 per cent. was charged. Only upon the theory that these two instruments do not set forth the real contract, can the loan be attacked as usurious. The defendant contends that the contract actually entered into embraced the stipulation that the agent was to receive a commission, and that the whole of the principal sum which the agent purported to loan was not to be received by the borrower. If the agent was actually empowered or instructed to enter into such an arrangement, the contention of the defendant would unquestionably be sound. But if the lender in fact parted with the entire principal sum, and was not concerned in and received no benefit under the collateral agreement between the agent and the borrower whereby the former reserved to himself a commission, it would be a serious matter to declare inoperative and void the deed thus honestly and in good faith taken by the lender. If the lender had no knowledge of this collateral agreement and received no part of the commission, but, when the agent in effect reported that he had made a loan of the entire principal sum at a legal rate, simply ratified this apparently legal contract, she would be both legally and equitably entitled to enforce the contract as written; for the borrower would be equally chargeable with the agent in concealing the true state of affairs and placing the lender in this situation.

It is a homely axiom that "it takes two to make a contract." Therefore, unless a borrower shows affirmatively

that one who loaned him money at the highest legal rate assented to the exaction of a commission by the latter's agent, it cannot be said that the lender ever understood and agreed that the collateral agreement between his agent and the borrower should be considered and become a part of the contract of loan.   The borrower has no right to assume that even a general agent has power to bind his principal by such an agreement; for the same being illegal and prohibited by law, the borrower is put upon immediate notice that the agent is transcending his general powers and going beyond the legal scope of his agency.   Only by showing that the agent was in fact authorized by his principal to reserve the commission can the borrower claim immunity because of an act by the agent which he is bound by law to know was illegal and not binding upon the principal unless previously authorized, or subsequently ratified, by the latter.   It is not enough to show that the agent reserved a commission, instead of turning over the entire amount of the principal sum which he undertook to loan in behalf of his principal; for the lender, in the absence of information as to the true state of facts, would have the right to assume that his agent would prove faithful to his trust; and though the agent be a general one, the lender would be under no duty of anticipating that he would make an illegal contract, and consequently if the agent actually made such a contract without the knowledge or consent of his principal, the latter would not be bound by it.

We do not mean to say the borrower must show that the lender expressly, in so many words, authorized his agent, before the transaction was consummated, to exact a commission.   If the lender be shown to have had actual knowledge of the agent's intention to charge a commission, and before accepting or ratifying the contract of loan became aware of the fact that a commission had been reserved, the law would imply assent to the agent's acts from the principal's silent acquiescence.   What we wish to be under-

stood as holding is, that unless it be shown that the lender had knowledge of the illegal agreement between the borrower and the agent, the law will not imply any assent on the part of the lender thereto, but will treat him as authorizing and ratifying a loan on the terms communicated to him by the agent, and expressed in the instruments which the borrower has signed as setting forth the contract made by him with the agent. It certainly would seem that if, by executing and delivering these formal instruments, the borrower induced the lender to honestly part with his money in consideration of the undertakings on the part of the borrower therein set forth, the latter would be estopped from claiming that such was not the real contract assented to by the lender.

2. The court charged the jury in the present case: "If you find from the evidence that Mr. Watson was the agent of Mrs. Camak and exacted a commission above eight per cent. for making the loan to Mrs. McLean, and Mrs. Camak had notice or knowledge of it, then the contract would be usurious; but if Mrs. Camak did not have notice or knowledge of Watson's charging the commission, then, I charge you, it would not be usurious. In determining whether or not Mrs. Camak had notice of the fact that Mr. Watson charged commission for making this loan, the jury can look to all the facts and circumstances of the transaction." It is alleged that this charge was erroneous, because "it restricted the question of usury to *actual* notice to Mrs. Camak of the taking of a commission by her agent, and shut the jury off from considering any facts or circumstances whatever as sufficient to *impute* notice or knowledge to Mrs. Camak."

The same question is also raised by an assignment of error upon the refusal of the court to give in charge the following written request: "If the agent of the lender exact a bonus or commission, and the lender, Mrs. Camak, had notice thereof, or if the facts were such as would *im-*

*pute* notice to Mrs. Camak, then the contract would be usurious. As to what facts would *impute* notice, that is a question for the jury entirely. You are to decide this question and find whether the facts in this case are such as would put a reasonable person on notice or inquiry, so as to *impute* notice."

From the language in which this request was couched, and especially in view of the peculiar legal significance of some of the words employed, we understand that counsel attempted to invoke in the defendant's behalf the doctrine of constructive notice. This becomes the more apparent in view of the fact that counsel complains of the above quoted charge on the ground that it restricted the jury to a consideration of "actual" notice, and in his written argument before this court, insists that "notice to the agent is notice to the principal." If such was the purpose of the request, it was not very happily nor accurately worded. For instance, "as to what facts would impute notice" is not, as this request undertakes to lay down, "a question for the jury entirely," but on the contrary, "constructive notice is a question of law," and a matter for determination by the court. 16 Am. & Eng. Enc. of Law, 792. That is to say, the law imputes notice upon a given state of facts; and it lies within the province of the jury simply to determine whether or not such facts exist, and not to say whether, as matter of law, they constitute constructive notice.

But even if this request correctly stated the law as to constructive notice, we think it was very properly refused, for the doctrine of constructive notice has no application whatever to the facts of this case. Otherwise, it would be an entirely useless formality to inquire whether the plaintiff really had knowledge of the fact that her agent exacted a commission; for it is not disputed that he did, and under the doctrine of constructive notice his knowledge of the fact would be legal notice to her. We have already seen that the purpose of showing knowledge on the part of the

principal in such a transaction is to prove that he at least tacitly assented to his agent's making an usurious loan. The principal is not chargeable with knowledge as to acts of his agent beyond the scope of the latter's authority, nor in any wise bound thereby; but the principal must be shown to have either tacitly or expressly assented to or ratified such acts on the part of his agent, before they can be considered as having any binding effect. Of course, the principal cannot be said to have tacitly assented to anything as to which he knew nothing; and it follows that the doctrine of constructive notice has no application to a case where the sole inquiry is whether or not a principal actually had knowledge of, and ratified, acts of his agent outside of the general authority conferred upon him.

If, however, counsel for the defendant intended to embody in his request the law as to *implied* notice, we still think the request was properly refused; for although the question of implied notice was more or less involved in this case, it was sufficiently covered by the charge given, and there was no evidence upon which to predicate the request to charge. Certainly, the plaintiff was not shown to have had knowledge of facts or circumstances which "would put a reasonable person on notice or inquiry," as to what occurred between Mr. Watson and Mrs. McLean with reference to the negotiation of this loan. The court expressly instructed the jury that "in determining whether or not Mrs. Camak had notice of the fact that Mr. Watson charged commission for making this loan, the jury can look to all the facts and circumstances of the transaction"; and under the evidence submitted, we think this instruction was certainly as favorable to the defendant as she had any right to expect, and it went quite as far as the court was warranted to go in charging upon this branch of the case.

The court was right in restricting the jury to a consideration of *actual* notice. It was absolutely essential to the maintenance of the defense that the defendant should show

the plaintiff had *actual* notice.   Of course, this could be accomplished by proving either express, or implied, notice to Mrs. Camak.   "Actual notice may be divided into express and implied.   Express notice embraces not only what may fairly be called knowledge, from the fact that it is derived from the highest evidence to be communicated by the human senses, but also that which is communicated by direct and positive information, either written or oral, from persons who are personally cognizant of the fact communicated.   The implication of notice arises when the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact."   16 Am. & Eng. Enc. of Law, 790.   In other words, it was incumbent upon the defendant to prove, either that the fact of the agent's exacting a commission was directly communicated to Mrs. Camak, or that she had actual knowledge of such other attending facts and circumstances as must of necessity have led her to a knowledge that such commission was exacted, if she had followed up the information she possessed and endeavored to ascertain the true state of affairs.

The charge of the court left the jury entirely free to find that the plaintiff was chargeable either with express or with implied notice.   We cannot say that their finding that she was chargeable with neither was erroneous, under the facts presented for their consideration.   The only circumstance which, in our opinion, could possibly count against the plaintiff was, that her agent testified:   "She did not pay me anything for making the loan, nor did she agree to pay anything."   This fact is capable of explanation, however, and is not inconsistent with the idea that it was not her purpose to require him to look to the borrower for compensation, or that she did not expect to pay him anything herself for his services in negotiating the loan.   The evidence shows she placed her entire business in McDuffie county in

his hands, and gave him sole management thereof, entrusting him to make such investments in her behalf as he saw proper.   She paid him for making collections for her, and it is not improbable she expected to pay him for his services in making investments for her, as well.   It appears he did not consult her about the advisability of making this particular loan, and she knew nothing of it until some time after it was made.   It is certain she did not authorize him to make it only on condition that he would look to the borrower for payment for his services, and would charge her nothing.   That he did not charge her anything and that she never agreed to pay him for his services in this particular instance is true, most probably for the reason that he considered himself sufficiently compensated by the commission he received from the borrower, and therefore never called upon Mrs. Camak for payment or rendered her a bill for his services.   If the defendant chose to rely upon this naked circumstance rather than bring out the whole truth by cross-examining the witness, we do not think she can now complain because the jury did not see proper to regard it as of sufficient importance to entitle her to a verdict.

*Judgment affirmed.*