## CLARKE v. HAVARD.

1. One who received money from the owner thereof for the express purpose of lending it out at interest, and with authority so to do, either general or limited, and who afterwards did lend the money to another, taking therefor a promissory note payable to such owner, is to be regarded as his agent, although the borrower, at the time of executing the note or subsequently, signed a paper purporting to constitute the person with whom he dealt in the transaction his agent to obtain the loan.

2  When in such a case the agent exacted from the borrower a commission which, added to the stipulated interest, made an amount exceeding that which could be lawfully charged as interest, the transaction was usurious if it was understood between the lender and the agent that the former was to pay nothing for the latter's services, and the circumstances were such that the lender must necessarily have known that the agent intended to charge the borrower, and did charge and collect from him, such commission for making the loan.

Argued June 9, — Decided July 11, 1900.

Complaint.    Before Judge Reid.    City court of Atlanta. October 4, 1899.

The following statement of the evidence in this case, taken from the bill of exceptions, is all that need be added to the facts reported in the opinion.   The plaintiff introduced the note sued on.   T. A. Clarke, sworn for the defendant, testified as follows:

I am the husband of the defendant, and represented her in getting the money on the note sued on; went to Mr. Barnett and asked for the money. He let us have six hundred and fifty-five dollars, and my recollection is that he took out fifteen dollars of that amount for searching the titles to the place. This was all I promised to pay. Can't read. Thought the note was for the amount I got, until the Georgia Loan & Trust Co. wrote for the interest, and then the roocas began. Thought it was Mr. Barnett's money we were getting. He had his sign on his door that he loaned money. Did not know the note was payable to the Security and Investment Co. until long afterwards. The note and papers were signed at the same time the money was paid. Defendant can't read. Mr. Barnett brought the papers to my wife folded up, and told her to sign. She asked what amount she was getting, and he said $655. She then signed the papers, and that was all. They were not read over to her and no bond for titles was given her. I signed the application for the loan in her name. — Manda A. Clarke, defendant, testified: My husband, T. A. Clarke, made the arrangements for me to borrow the money. I went to Mr. Barnett's office and signed the papers for the money. Can't read. He did not read to me the papers signed. Money was paid over same time papers were signed. Never knew the note was for $750 until long afterwards. None of the papers were read to me. Mr. Barnett just brought the papers to me, folded up, and told me to sign. Never heard a word about having to pay Mr. Barnett ninety-five dollars commission.

Samuel Barnett, sworn for plaintiff, testified as follows: The defendant employed me to obtain the loan. She signed the application. Ninety-five dollars was paid me as commission for procuring the loan. I represented the borrower, and the payee of the note knew nothing of my commission. I did not know the defendant and her husband could not read. Neither asked that the papers be read. I explained the matter to them, and did not prevent their reading. I did not notice that they did not read the papers. I am not the agent of the lender and did not act as such. The Georgia Loan & Trust Co. got thirty dollars of the commission I charged. They and I are brokers, and do not act as agents of any lenders.

We obtain money from different capitalists at different times. The interest paid on the note was sent to the Georgia Loan & Trust Co., at Macon, Georgia, as a matter of convenience, and is not a payment until it reaches the lender. I had nothing to do with collecting the interest. The Security and Investment Co., the payee of the note, is a partnership. Don't know whether the members of the firm are stockholders in the Georgia Loan & Trust Co. or not. Said Georgia Loan & Trust Co. did not loan the money. It was sent them by the Security Investment Co., payees of the note, who loaned the money. The Security Investment Co. got no commissions and only seven per cent. interest. — Plaintiff also introduced the application for loan. This contained a statement that S. Barnett was constituted the agent of the borrower (defendant) to procure a loan of $750, was addressed to S. Barnett, contained the statement that applicant had no other real estate, and was dated January 18th, 1896; indorsed approved by Security Investment Co. Plaintiff also introduced in evidence the following statement: "Atlanta, Ga., January 20th, 1896. Amanda A. Clarke, in account S. Barnett, loan Sec. I. Co., 5 years, 6 mo., 7 per cent., $750.00; to com. &c. $95.00, net cash $655.00. [Signed] Manda A. Clarke." T. A. Clarke, recalled, stated that he did not know the Georgia Loan & Trust Co. had anything to do with the loan until they called for payment of interest.

*R. O. Lovett* and *Humphries & Humphries,* for plaintiff in error. *Samuel Barnett,* contra.

LUMPKIN, P. J. This case turns upon the questions dealt with below. It is an action upon a promissory note for the principal sum of $750, and three coupon interest notes thereto attached. The main note is dated January 1, 1896, and due January 1, 1901, with interest from date at 7 per cent. per annum, evidenced by ten coupon notes, including those sued upon, which were on their face overdue when the action was brought. The large note is payable to the order of the Security Investment Company of Bridgeport, Conn., and stipulates that, if default should be made in the payment of interest, it shall, at the holder's option, become due and payable regardless of the date of maturity. The smaller notes are payable to the Invest-

ment Company or bearer, and stipulate for interest after their maturity at 8 per cent. per annum. The plaintiff's petition contains an allegation that all of these notes were, directly after their execution, duly assigned to her. This allegation is not denied in the answer, but the defendant therein alleges that "the contract, as made by her, was that she was to borrow of the payee of said notes the sum of $655," that this was the amount actually loaned to her, and that "she does not owe the amount claimed in said suit as principal, because there is charged as part of said principal the sum of ninety-five dollars, the same being charged against this defendant as commissions by officers and agents of the payee of said notes, and the same is illegal, being charged under the name of commissions to avoid the laws against usury." The answer further states that the amount of the usury is $89.95, and sets forth in detail the facts and figures upon which this assertion is based. It seems to have been properly conceded that the defense of usury, if well founded in fact, was good against the plaintiff, though she became a bona fide holder for value before the maturity of the notes. See *Angier* v. *Smith*, 101 *Ga.* 844. At the conclusion of the evidence on both sides, the court directed a verdict in favor of the plaintiff for the full amount of the principal and interest claimed in the petition, and the defendant excepted. The evidence is set forth in the report preceding this opinion.

1. The first question for determination is, did the evidence warrant a finding that Barnett was the agent of the Investment Company to make the loan? We think it did. The loan was certainly made for and in behalf of that company. Of necessity it had to be represented in the transaction by some one acting as its agent. It could not possibly make a loan in any other way. There is no evidence tending to show that it was in fact represented by any one other than the Georgia Loan & Trust Company or Barnett. He and the Georgia Company were acting in concert. He testified that it did not loan the money, and that the Investment Company did. But how? On this particular point his testimony is not lucid, but the real meaning of it, when taken in connection with other things stated by him, is not difficult of ascertainment. He said: "The Georgia Loan & Trust Co. got thirty dollars of the commission

I charged. They and I are brokers, and do not act as agents of any lenders. We obtain money from different capitalists at different times. The interest paid on the note was sent to the Georgia Loan & Trust Co., at Macon, Georgia, as a matter of convenience, and is not a payment until it reaches the lender." He further testified that the defendant employed him to obtain the loan; that he represented the borrower; that he was not the agent of the lender, and did not act as such. As will have been observed, the written application signed by the defendant and purporting to constitute Barnett her agent to procure the loan was dated January 18, though apparently the note was executed on January 1. Barnett stated facts and conclusions therefrom. The conclusions, however, were merely his own. Are they necessarily correct and, as such, binding and conclusive upon the defendant? Would not these facts and the other facts in the case warrant other and very different conclusions? He obtained money from the Investment Company to lend out. For whom? Why, for the company, of course. At the time he received this money the defendant had not asked for a loan. It was on hand when she called. Up to that point who, and who alone, was represented by Barnett? The answer is simple. Does it alter the actual facts of the transaction that the borrower signed a paper, bearing a date seventeen days later than that of the note, stating that Barnett was thereby made her agent to borrow $750? Doubtless this discrepancy in dates is susceptible of explanation. Indeed, the defendant's receipt to Barnett for the money borrowed was dated January 20. But what difference would it make that the note was dated back, which must have been the case if we accept as true the statement of the witness T. A. Clarke, that "the note and papers were signed at the same time the money was paid"? Could not the jury have found, and ought they not, in view of all the evidence, to have found, that the contract embraced in the application was purely colorable? The law cares nothing about the form of a transaction, but characterizes it according to its substance and results. What is the substance of this transaction? Manda A. Clarke, wishing to borrow money, applied to Barnett for a loan, supposing she was dealing exclusively with him. He had on hand money

which had been sent to him by the Investment Company through the Georgia Company, his coagent, to be loaned. He let the applicant have the money, taking her note payable to the Investment Company, after deducting $95 for commissions. The Georgia Company collected what was paid on the interest notes and forwarded the same to the owner. Against all this there is nothing to show agency for the borrower, except Barnett's statement of a mere conclusion, backed by the seemingly belated application for the loan. Certainly it would not have required a strain to find that the loan was made by Barnett as agent of the Investment Company. What service did he render the defendant as her agent which was not directly connected with that he performed in behalf of the Investment Company, agreeably to his undertaking to effect for it a loan of money which it had previously sent to him for that purpose? How, under the circumstances, could it have been possible for him to do anything in her behalf in procuring the loan? He did not ask the Investment Company to make a loan to the defendant. All he had to do when she applied to him for the money was to let her have it. This he did, and in so doing rendered her no more service, save as to examining her titles, than every lender does when he loans money to a borrower on application. There is no question here as to Barnett's right to make a charge for examining the titles.

This case is obviously different upon its facts from that of Merck v. Mortgage Co., 79 Ga. 213, and numerous others of its class, in which the lender received the borrower's application, passed upon it for himself, and for himself decided whether or not the security was good and the terms offered satisfactory. Here, Barnett passed upon these and all kindred questions for the lender, manifestly with authority so to do, which was either general or limited by instructions not disclosed. If this does not amount to agency, we have no conception of what agency is. The trial court, therefore, could not properly have directed a verdict for the plaintiff on the theory that the evidence demanded a finding that Barnett was exclusively the borrower's agent and in no sense the agent of the lender.

2. It is, however, contended that even if he were such agent, and even if he did exact a commission which, added to the

stipulated interest, would make an amount exceeding the max-
imum legal rate of interest, the transaction was not usurious,
for the reason that the lender did not receive any part of the
commission or know that a commission was charged.   In this
connection Barnett testified: "the payee of the note knew noth-
ing of my commission."   He did not testify that this payee was
ignorant of the fact that it was his custom to charge commis-
sions, a custom which must inevitably pertain to the business
of brokers who lend out money belonging to others.   Every-
body at all informed with reference to such matters knows that
services rendered by such brokers are not, and in the nature
of things can not on sound business principles be, rendered
gratuitously.   The evidence in his case warranted a finding
that the Investment Company knew Barnett was in the busi-
ness of lending money; that it sent him its money to lend, and
must also have known that he expected compensation for his
labor.   It is doubtless true, as Barnett testified, that it knew
nothing of his commission; that is, it did not know the precise
amount he charged when he made this particular loan.   That
this is really what he meant by the words, "the payee of the
note knew nothing of my commission," is conclusively shown
by what he says in his brief as attorney for the defendant in
error.   We quote therefrom: "The Security Investment Co.
did not know what commissions Barnett charged; they them-
selves received nothing, only their 7% interest."   That is, the
company knew Barnett charged commissions, but did not know
to how much they amounted.   And, independently of the
above-quoted expression, there is little room for doubting that
the company, when it forwarded the money to be loaned, was
not ignorant of the fact that Barnett expected to make some-
thing for placing it in the hands of a borrower.   Affecting not
to know this would be admitting a total disregard of the plain-
est principles of human nature.   So, then, the jury might well
have concluded that the Investment Company knew Barnett
was to be paid, and also that it understood it was not to do the
paying; and further, that it must have known the borrower,
when he came along, was to do so.   They could, therefore, have
found that the company occupied the position of at least tacitly

authorizing its agent to exact such a commission on the loan as the borrower might be induced to pay.

A money-lender can not, in this State, lawfully contract for or reserve any greater rate of interest than 8 per cent. per annum, and the prohibition is just as strong against doing so indirectly as it is against doing so openly and without pretense. It is now too well settled to admit of doubt, that if the agent of a money-lender, with his knowledge, charges the borrower a commission, it is the same thing in law as if the lender charged it himself. This is so because he gets a benefit from the agent's services, and because in such cases there is, as to this matter, no separation of principal and agent. The payment of a commission to the lender's agent, being a part of what the borrower expends for the use of the amount he actually receives, is in effect a payment to the principal, if he gives countenance to the exaction of such commission, and is in the nature of interest on the loan. If, then, the commission so paid and the stipulated interest together exceed the lawful interest, the transaction is usurious. These are familiar principles and should be readily accepted as sound. It only remains to show that this court did not depart from them in the case of *McLean* v. *Camak*, 97 *Ga.* 804, and in so doing make clear the distinction between that case and the one now before us. The facts of these cases are widely different. Watson was Mrs. Camak's general agent to collect and invest her funds. She paid him for making collections, and it did not appear but that she expected to pay him also for his services in making investments. In this connection the writer, in speaking of the making by Watson of the loan then under review, said (page 813): "She paid him for making collections for her, and it is not improbable she expected to pay him for his services in making investments for her, as well. It appears he did not consult her about the advisability of making this particular loan, and she knew nothing of it until some time after it was made. It is certain she did not authorize him to make it only on condition that he would look to the borrower for payment for his services and would charge her nothing. That he did not charge her anything and that she never agreed to pay him for his services in this particular instance is true, most probably for the reason that he considered himself suffi-

ciently compensated by the commission he received from the borrower, and therefore never called upon Mrs. Camak for payment or rendered her a bill for his services." The defendant did not probe to the bottom the question whether Mrs. Camak did or did not expect to pay Watson for lending the money to Mrs. McLean, but chose to rely on the naked circumstance that she did not in point of fact pay as conclusive upon the inquiry whether or not she really supposed she would be asked to pay. The verdict was in her favor, and was maintainable on the theory that the evidence did not demand a finding that she either directly or indirectly authorized or sanctioned the making by her agent of a contract infected with usury.

It is in the present case, as already noted, obvious that the Investment Company never expected a bill from the Georgia Company or from Barnett for their services in making the loan to Clarke. The *McLean* case is, at best, a close one, and the doctrine of it should not be extended beyond its peculiar facts. It was carefully considered, and the court, foreseeing the danger of going too far on the line then pursued, took occasion to remark (page 808): "We do not mean to say that the borrower must show that the lender expressly, in so many words, authorized his agent, before the transaction was consummated, to exact a commission. If the lender be shown to have had actual knowledge of the agent's intention to charge a commission, and before accepting or ratifying the contract of loan became aware of the fact that a commission had been reserved, the law would imply assent to the agent's acts from the principal's silent acquiescence." The language just quoted applies to the case now in hand; for, if our reasoning is sound, there was ample evidence to warrant and support the inferences, that the Investment Company understood perfectly well no commission was to be charged against it; that it was fully aware of an intention on the part of the Georgia Company and Barnett to make a charge against the borrower for their services; that when the note was returned to the Investment Company it must, under all the circumstances, necessarily have known that a commission had been taken from the maker; and that, without prosecuting any inquiry as to the amount of the commission exacted, but choosing rather not to be too well informed as to this matter,

it by "silent acquiescence" assented to Barnett's act in appropriating the same. In other words, it is fairly inferable from the evidence submitted pro and con that there was a tacit understanding between the investment company and its Georgia agents that they should undertake in its behalf to effect loans of the funds which it advanced to them, looking in each particular instance to the borrower alone for compensation, which was to be realized by the exaction of such commissions as he might be willing to pay under the guise of a written agreement signed by him, purporting to constitute the particular agent of the company with whom he dealt his agent to apply for and negotiate in his behalf the desired loan. If so, such pretended collateral agreement between the lender's agent and the borrower would be but a thin and transparent cloak ill-concealing the real nature of the transaction it was intended to shield.

Before concluding it is but fair to point out that it would have been perfectly legitimate and proper for the plaintiff to meet and overcome the defense sought to be established, by introducing evidence, if available, to show that the Investment Company, although not agreeing to itself pay its Georgia agents anything for their services, nevertheless expressly limited their authority, in the matter of exacting commissions from borrowers, to reserving such a commission only as, added to the stipulated interest to be paid to the company, if less than 8 per cent., would not render any particular loan usurious. For illustration, if such was the limited authority of the Georgia Company and Barnett, they could not, without violating their duty to their principal, have charged the defendant a commission amounting to more than 1 per cent. per annum, for the interest which she agreed to pay on the loan was at the yearly rate of 7 per cent.; and it follows that if, without any secret understanding with or connivance on the part of the company, they proved themselves to be faithless to their trust, it would not be legally bound by any collateral agreement made between them and the defendant, whereby she authorized them to reserve, as compensation for their alleged services to her, the large commission which they exacted. That this is sound reasoning will, we believe, be apparent when considered in connection with the following extract taken from the

opinion filed in the *McLean* case, supra, page 807 : "It is a homely axiom that 'it takes two to make a contract.' Therefore, unless a borrower shows affirmatively that one who loaned him money at the highest legal rate assented to the exaction of a commission by the latter's agent, it can not be said that the lender ever understood and agreed that the collateral agreement between his agent and the borrower should be considered and become a part of the contract of loan. The borrower has no right to assume that even a general agent has power to bind his principal by such an agreement; for, the same being illegal and prohibited by law, the borrower is put upon immediate notice that the agent is transcending his general powers and going beyond the legal scope of his agency. Only by showing that the agent was in fact authorized by his principal to reserve the commission can the borrower claim immunity because of an act by the agent which he is bound by law to know was illegal and not binding upon the principal unless previously authorized, or subsequently ratified, by the latter. It is not enough to show that the agent reserved a commission, instead of turning over the entire amount of the principal sum which he undertook to loan in behalf of his principal; for the lender, in the absence of information as to the true state of facts, would have the right to assume that his agent would prove faithful to his trust; and though the agent be a general one, the lender would be under no duty of anticipating that he would make an illegal contract, and consequently if the agent actually made such a contract without the knowledge or consent of his principal, the latter would not be bound by it. . . What we wish to be understood as holding is, that unless it be shown that the lender had knowledge of the illegal agreement between the borrower and the agent, the law will not imply any assent on the part of the lender thereto, but will treat him as authorizing and ratifying a loan on the terms communicated to him by the agent and expressed in the instruments which the borrower has signed as setting forth the contract made by him with the agent. It certainly would seem that if by executing and delivering these formal instruments, the borrower induced the lender to honestly part with his money in consideration of the undertakings on the part of the

borrower therein set forth, the latter would be estopped from claiming that such was not the real contract assented to by the lender."

In the present case, it would seem that, in the court below, the plaintiff stood squarely upon the contention that Barnett was in no sense the agent of the Investment Company, but acted solely in behalf of the defendant, as evidenced by her written application for the loan. At any rate, it is certainly true the plaintiff did not offer any evidence tending to show that the authority of Barnett, in the matter of charging commissions from borrowers, was in any wise limited by the company; and consequently the record before us contains no hint or suggestion that, in reserving the large commission exacted of the defendant, Barnett proved himself to be a faithless and unscrupulous agent. If the plaintiff desires to avail herself of such a contention, opportunity to do so will be afforded her by the judgment we now render; for we feel constrained to order another hearing on the ground that the trial judge erred in not submitting the case to the jury.

*Judgment reversed. All the Justices concurring.*