PAUL *v.* THOMPSON.

SIMMONS, C. J. 1. In a suit by a wife to recover money paid by her husband to a third party in settlement of debts of the husband, evidence as to conversations between the defendant and the husband and statements of the husband to the defendant that the money was his is admissible on the question of notice to the defendant of the wife's ownership.

2. No material error of law was committed, and the evidence authorized a finding by the judge, who tried the case without the intervention of a jury, that the defendant had no notice of the wife's claims to the money paid by the husband.          *Judgment affirmed. By five Justices.*

Argued June 30, — Decided August 11, 1903.

Complaint. Before Judge Reid. City court of Atlanta. - October 21, 1902.

Paul contracted with Thompson for the purchase of certain realty, agreeing to pay therefor $10,000 in three payments: $2,500 on or before April 12, 1901, $5,000 on July 1, 1901, and $2,500 within a year thereafter. He paid $100 upon the signing of an option, $200 on April 12, $2,200 on May 2, and $5,000 on July 1, 1901. This suit was brought in November, 1901, by the wife of Paul, alleging that $3,300 of the money so paid to Thompson was her money, and was received by him with actual and constructive notice of this fact. The defense was that he had no notice that any of the money belonged to the plaintiff. The case was submitted to the judge without a jury, and he found for the defendant. The plaintiff excepted to this judgment, and to numerous rulings admitting

evidence over her objection that it was irrelevant, immaterial, and incompetent to affect her rights. There was testimony by the plaintiff and her husband, that the amount sued for was the separate personal property of the plaintiff; that she did not give it to any one, but her husband took it from her, she giving it up unwillingly. Of this amount $2,000 was given to her by her father, Napoleon Mumblo, who resided in Coleman, South Dakota, to which place she went from Atlanta, Georgia, in April, 1901. She then and there asked her father for $2,000, and he gave it to her for her own use, not knowing for what purpose she wanted it or what she intended to do with it. Ware, a real estate agent who negotiated the sale of the property between Thompson and Paul, testified that he asked Thompson what were Paul's chances to get up the money, and Thompson said that Paul's wife had gone out west to get the money from her father, and in answer to the question whether he thought she would succeed in getting it, he said yes. She was then on her way out there to raise the money to make those payments.

The defendant testified : Paul did not make any statement to me as to where he got the money, at the time he made the first payment of $100, or at or before the time he paid the $200, except that he had more of it in a roll. When he took out the $200 he said, "I have got more of it." He made no statement at all with reference to where he got it. The first $100 was paid by him to secure this trade. That option was about to run out, and he paid me $200 to secure the option for ten days longer. He paid me then $2,200. I never met Mrs. Paul until after this deal was made and he was in possession of the property. I did not know about when she went to Dakota to see her father. I think Paul said his wife had gone after the money ; but he did not tell me where, as I remember. My recollection is that the conversation between Ware and me was about the last payment. Ware had obtained a note for $500 from Paul, and he asked me about it, and what I would give him for the note, and what I thought about Paul paying him. I told him that Paul stated that his father-in-law would sell his farm in Dakota that fall and would let him have the money to pay this note and the balance on the property he bought of me; that he was going to invest the balance in Atlanta property and live here and go into business with him. At the time Paul paid me the $2,200 he made no statement to me as to where he had

obtained the money. I lent him $50 on May 18, to go to New York and get his money. I did not know whether he went to New York or not. He was absent from the city. When he came back he told me he had been to New York. · I did not ask him where he got the money, when he paid the $100, or when he paid the $200, or when he paid the $2,200.

It further appeared from evidence introduced by the defendant, that of the $5,000 paid by Paul on July 1, $4,000 was lent to him by Mecaslin. Four witnesses gave testimony tending to impeach the plaintiff and her husband as of bad character.

The evidence admitted over the objections before referred to was as follows: (1) Testimony of Paul — (*a*) "I did not tell Thompson that I got the greater part, if not the whole, of the money paid to him from some source in New York. I did state to Thompson that I had interests in New York from which I could procure money, prior to the time I paid him any money. I did not go to New York before I made the $2,500 payment to Thompson, and state that I went there for the purpose of raising money to make this payment." (*b*) "I do not remember whether I stated, before I made the $5,000 payment, that I had obtained the $1,000, which I added to the $4,000 which I borrowed from Mecaslin, from some source in New York. I did go to New York, and stated that I went there to get money." (*c*) "About the time I made the $5,000 payment I stated (in the presence of Thompson) to Mescalin, who had lent me $4,000 thereof, that I expected my father-in-law, who resided in the west, to sell a farm which he had there, and lend me the money to take up the note which I had executed to Mecaslin. I do not remember whether this was the first time that I referred to the fact that I expected aid from my father-in-law." ·(*d*) "I do not remember whether or not, whenever I referred to any expected aid from my father-in-law, I spoke of it as aid to be extended to me and not to my wife. I think I did state, in the presence of Thompson, that I expected aid from my father-in-law, but did not state definitely that I was going to get it. I think I did state that he expected to take an interest in the business for which the property was bought of Thompson." (2) Testimony of Mecaslin — "I think Paul said, when he made the $5,000 payment to Thompson, that he got the $1,000 (beside the $4,000 I had lent him) from a party he was at work for in New York." (3) Testimony

of defendant — (a) "Paul stated to me that he was working for a firm in New York when he bought this place, and that they owed him about $7,000. I asked him where he was to get the balance from. He said his father-in-law had a farm in Dakota, and that he was going to sell the farm and furnish him the balance of the money. I can not exactly state what time he made the statements about his father-in-law; it was several times. He was with me two or three weeks off and on, very often three or four nights in the week; but he stated to me that his father-in-law was going to sell this farm and furnish him the balance of the money, if he failed to get it. He said, if he could not get the money in New York, that his father-in-law would lend him the money. He made the statement that his father-in-law would lend him the money when he sold his farm, and that he was going to invest the balance in Atlanta as a home. (b) When he came back to the city he told me he had been to New York. (c) At the time he paid the $5,000 he told me he got $1,000 of it in New York, and that he had more. (d) Between the time of the payment of the $2,200 and the payment of the $5,000 Paul did not make any statement to me that differed in any manner from the statement that he had made at the time he closed the matter up, as to where he got the money." (4) The papers evidencing the contract of sale between Thompson and Paul. (5) The check for $50, before referred to as having been lent by Thompson to Paul to go to New York.

*John L. Hopkins & Sons,* for plaintiff. Married woman can not pay husband's debt: Civil Code, § 2488. Can recover of creditor who knowingly received: 56 *Ga.* 22; 70 *Ga.* 179–184. Her consent immaterial: 54 *Ga.* 543. Can not ratify: 107 *Ga.* 804; 112 *Ga.* 330–333. Payment void as to all affected with notice: 62 *Ga.* 733. Notice, putting on inquiry: Civil Code, § 3933; 54 *Ga.* 547; 74 *Ga.* 348; 78 *Ga.* 586; 105 *Ga.* 553; 97 *Ga.* 810; Wade on Notice, §§ 10, 11, 17, 27; 16 Am. & Eng. Enc. L. (1st ed.) 787, 791; 3 L. R. A. 563. No plea to support evidence objected to: 90 *Ga.* 299. Direction of verdict: 86 *Ga.* 756.

*Anderson, Anderson & Thomas,* for defendant. Wife may use her money for husband's benefit, save as expressly prohibited by Civil Code, § 2488: 85 *Ga.* 200; 92 *Ga.* 319, 370; 100 *Ga.* 503, 506; 103 *Ga.* 745.