BARKSDALE, adm'r, v. SECURITY INVESTMENT CO.

1. In its principal elements and characteristics, this case is ruled by Merck v. American Freehold Co., 79 Ga. 213.
2. The mere fact that a lender of money deposited in bank a fund which should be subject to the check of a loan broker for the amount of a loan only in the event that the lender, after an examination by himself of the application of the prospective borrower and the security offered, should approve the same, and for himself decide to make the loan, did not render the broker the agent of the lender for the purpose of making loans.
3. A stenographic report of the testimony alleged to have been given by a witness on a former trial was not competent evidence without proof of its genuineness and correctness.
4. If a ruling were proper, it will be sustained, though a wrong reason were given therefor.

Argued May 20,—Decided June 9, 1904.

Complaint.    Before Judge Holden.    Wilkes superior court. December 18, 1903.

Colley & Sims and S. H. Hardeman. for plaintiff in error.

William Wynne, B. S. Irvin, and Anderson, Anderson & Thomas, contra.

FISH, P. J.  The Security Investment Company, alleged to be a copartnership composed of Elliot M. Beardsley and Augustus A. McKelvey, of Bridgeport, Connecticut, sued B. F. Barksdale on several promissory notes, and, in addition to a general judgment, prayed for a special lien on certain land described in a deed given as security for the payment of the notes.  Defendant pleaded usury. Pending the suit the defendant died, and R. O. Barksdale, administrator, was made party defendant.  On the trial, at the conclusion of the evidence, the court directed a verdict for the plaintiff. The case is here upon exceptions by the defendant to the overruling of his motion for a new trial.  From the undisputed evidence in the record we gather the following facts:  In the early part of 1888 B. F. Barksdale employed B. S. Irvin to obtain a loan of $3,800 for him upon the land in question.  Irvin was a loan broker, doing business in Washington, Wilkes county, who did not lend his own money, but simply undertook to find parties willing to lend money to prospective borrowers, and charged commissions for his services.  He was the correspondent of the Georgia Loan and Trust Company (hereafter called the Trust Company), a corporation of this State, which was itself engaged in the similar business of a mere loan broker or negotiator, charging borrowers a commission for its services.  Irvin took Barksdale's application for the loan and forwarded it to the Trust Company.  The loan was made for $3,800.  The notes for the same were dated February 1, 1888, due February 1, 1893, bearing interest at eight per cent. per annum, payable semi-annually, according to interest coupons thereto attached, and were secured by a mortgage on the land in question.  The notes and mortgage were executed in favor of the Trust Company, though it was not the real lender of the money, the papers being executed in this form for convenience, and immediately thereafter were transferred to John Stringer, the true lender.  Irvin charged Barksdale a commission of ten per cent. for procuring the loan, of which Irvin got three per cent. and the Trust Company seven per cent., which was deducted from the amount loaned by Stringer.  Before the maturity of this loan, the Trust Company had arranged with the Security Investment Company (hereafter called the Investment Company) to negotiate a new loan to take the place of the old one.  On January 28, 1893, Barksdale again applied to Irvin for a loan of $3,800, for the pur-

pose of paying off the old loan. In the written application signed by Barksdale, he made the following agreement: " I hereby agree to pay all expenses incurred in negotiating the above loan, in examining the premises, investigating titles to the lands offered as security, and in executing all necessary papers; and I understand that the loan is granted upon the representations above made as to my property and condition, all of which I declare to be true." On January 31, 1893, Irvin, as examiner, made a report of his examination of the premises described in the application, and declared that, in his opinion, the property offered was ample security for a loan of $3,800. Endorsed on the application were the words, " Renewal of 1872," 1872 being the number of the old loan; also, " Approved by the Security Investment Company, I. W. Beardsley." These endorsements were not dated. Upon this application the new loan was negotiated and made. $3,800 belonging to the Investment Company were appropriated to the payment of that amount due John Stringer and in extinguishment of the old loan, and on February 1, 1893, Barksdale executed four promissory notes, payable to the Investment Company or order, five years after date, and aggregating $3,800. These notes had interest coupons attached, for semi-annual interest at the rate of seven and one half per cent. per annum; and there were additional interest notes executed, but not attached, representing semi-annual interest upon the principal notes, at the rate of one half of one per cent. per annum. All these notes for principal and interest were secured by a deed to the land in question, executed by Barksdale to the Investment Company, upon the same date as the notes, and conformably to §§ 1969 and 1970 of the Code of 1882. On January 31, 1893, Barksdale paid Irvin $475, of which $152 were for the semi-annual interest due on the old loan on February 1, 1893, and $323 were for commissions for negotiating the new loan. Of these commissions Irvin retained $57 and sent the balance to the Trust Company, as its share of the same for its services in negotiating the new loan. The Investment Company was the real lender and parted with the full amount of $3,800, paid to Stringer in settlement of the old loan, and received neither any part of the commissions, nor any bonus or brokerage for making the loan. It contracted for nothing more than the lawful interest, and neither expected nor received anything more than that. Its method of

doing business was, after making loans, to sell them to other parties as promptly as possible, transferring the principal notes, with the coupons for seven and one half per cent. interest, and retaining, as its own profit, the additional interest coupons for one half of one per cent. interest. The principal notes sued on in this case, with the attached coupons, were transferred to other parties, who, after maturity and non-payment, transferred them back to the Investment Company, that it might bring suit on them, it having kept the security deed for the benefit of all parties concerned.

The Trust Company procured the Investment Company to make loans submitted by it, but it had other correspondents and connections, and often procured lenders through other channels. The Trust Company had been thus dealing with the Investment Company for about a year when the loan in the present case was made. The Trust Company was not engaged in lending money itself, although it appeared that as a business policy it sometimes purchased a loan upon its maturity and non-payment, which had been negotiated through its instrumentality, in order that the lender might be induced to accept other loans which it might have for negotiation. When the original loan was negotiated, February 1, 1888, the Security Investment Company was composed of Burr and Knapp, who were, respectively, the president and vice-president of the Georgia Loan and Trust Company. At that time and until January, 1892, Burr and Knapp, who were brokers in Bridgeport, Connecticut, did some business as negotiators of loans, and the Trust Company paid them a part of the commissions received by it whenever they secured an investor for one of its loans. As the notes and mortgages or deeds were at that time, for convenience, made to the Trust Company, though the money loaned did not belong to it, but to the parties advancing the same as investors, the facts had to be explained whenever suits were brought to collect the loans. To avoid this, the Trust Company induced other parties at Bridgeport to form a new Security Investment Company, for the purpose of making some of these loans. The old Security and Investment Company, composed of Burr and Knapp, went out of business and the new Security and Investment Company, composed of entirely different parties, was formed, in January, 1892. As before stated

the Trust Company never paid this new Security Investment Company any commissions, brokerage, or bonus for loans made by it; all it made was the one half of one per cent. interest per annum, which it secured by retaining the additional coupons for that amount of interest, as before stated. Neither Irvin nor the Trust Company was authorized by the Investment Company, which made the loan in this case, to make loans without first getting the approval of the Company; and when the loan that was made to Barksdale in 1888 became due, the Trust Company obtained the consent of the Investment Company to make the new loan and take up the old one. The course of business was, for the Trust Company to forward the papers, such as the application of the borrower, report of the examiner, etc., to the Investment Company, which passed upon them for itself, and itself decided whether or not the security was good and the terms offered satisfactory, and for itself determined which loans, if any, it would make. While the Trust Company had no power to lend the money of the Investment Company, until after the latter Company had passed on the application and approved the same, and thus anthorized the loan, it appeared that the Trust Company had, in an occasional instance, for the purpose of closing the loan promptly and as a business policy, made a loan and taken the papers to the Investment Company, assuming the risk, however, of the Investment Company approving the loan and agreeing to make it, and that in such cases the Investment Company had, as a matter of fact, taken the loans, though made without its authority. This did not appear to be the case in the loan made to Barksdale. On the contrary, the uncontradicted testimony of the treasurer and general manager of the Trust Company was as follows, on this subject: " I will say, as to this loan [the one made in 1888], the original investor, John Stringer, was paid off the $3800.00 entirely. We then had to negotiate the loan through a new party whom we had secured in the meantime. When this loan became due, we obtained the consent of the Security Investment Company to make the loan, and took up the old loan." But even if the loan in the present case were made by the Trust Company before it had been approved and authorized by the Investment Company, there was no evidence that the latter company had knowledge of this fact. While the evidence on the subject is somewhat con-

fused, viewed in the strongest light for the plaintiff in error it shows that the Investment Company kept on deposit, in the Chemical National Bank of New York, money which the Trust Company could draw on, in favor of the borrower, for the amount of the loan, after the Investment Company had examined the application and other papers for the loan and had approved the same and decided to make the loan. It appeared that Burr and Knapp, the president and vice-president of the Trust Company, were attorneys in fact for the Investment Company, but what their powers were as such did not appear, further than that Knapp, as such attorney in fact, transferred the notes sued on in this case to the different parties who purchased them from the Investment Company.

1. These facts, in view of the prior rulings of this court, demanded a verdict for the plaintiff in the court below, and the court did not err in so directing. In *Merck's* case, 79 *Ga.* 213, the leading case on the subject, which has been frequently followed, it was held: "1. Where the lender of money neither takes nor contracts to take anything beyond lawful interest, the loan is not rendered usurious by what the borrower does in procuring the loan and using its proceeds. Thus, that the borrower contracts with one engaged in the intermediary business of procuring loans, to pay him out of the loan for his services, and does so pay him, will not infect the loan, the lender having no interest in such intermediary business or its proceeds. 2. By using intermediaries as channels of transmission for papers, relying upon their inspection of property and examination of titles, made at the borrower's instance, and forwarding the money through them also at his instance, the lender does not constitute them his agents to make the loan, and is not chargeable with the consequences of dealings between them and the borrower, whether those dealings be public or private, known or unknown." In the opinion in that case Chief Justice Bleckley said: "If he [the lender] holds control of his capital and decides for himself when he will part with it, and on what terms, and has no terms but lawful interest and good security, and satisfies himself that the security is good, he transacts his own business and is not to be judged by the law of agency." He further said: " . . he who is satisfied with another's inspection of property or examination of titles does not

render that other his agent by forbearing to inspect or examine for himself," and, if he be a lender, " does not the less judge of the security by basing his judgment on the representation or opinion of whomsoever commands his confidence." Again, the learned Justice said : " But grant that the middlemen were by legal implication agents of both parties, the lender as well as the borrower, for several purposes, such as receiving and delivering papers, inspecting the property, examining the title, etc., it is certain, according to the evidence in the record, that they were not agents express or implied for making the loan, fixing the terms of it, or accepting the security. Nor did they in fact do these things, but they were done by Sherwood. Now, unless some one who represented the lender in making the contract took or contracted to take for himself or the lender or some other person, something from the borrower over and above a legal rate of interest, how could the contract, under our code, be usurious ? It seems to us legally impossible that it could be." This language is equally applicable to the facts of the case now in hand. Indeed the present case, under its facts, is controlled by the rulings made in *Merck's* case.

2. The mere fact that the Investment Company deposited in the Chemical National Bank a fund which should be subject to the check of the Trust Company for the amount of a loan, only in the event that the Investment Company, after an examination by itself of the application of the prospective borrower and the security offered for the loan, should approve the same and for itself decide to make the loan, did not render the Trust Company the agent of the Investment Company for the purpose of making loans. Such a course of business was evidently for the purpose of more promptly placing the money in the hands of the borrower, by saving the time that would elapse if after the papers should be approved by the Investment Company and returned to the Trust Company, and the notes and security deed should be executed by the borrower and sent to and received by the Investment Company, it should then forward a check to the Trust Company for the amount of the loan. Counsel for the plaintiff in error largely relied upon the case of *Clarke* v. *Havard*, 111 *Ga.* 242, wherein it was held, that when one who received money from the owner thereof for the express purpose of lending it out at interest, and

with authority so to do, either general or limited, afterwards loaned the money to another and exacted from the borrower a commission which, added to the stipulated interest, made an amount which exceeded that which could be lawfully charged as interest, such transaction was usurious, if it was understood between the lender and his agent that the former was to pay nothing for the latter's services, and the circumstances were such that the lender must necessarily have known that the agent intended to charge the borrower, and did charge and collect from him, such commission for making the loan.    It is quite apparent that the ruling then made is not applicable to the facts of the present case. In that case Presiding Justice Lumpkin said: "This case is obviously different upon its facts from that of *Merck* v. *Mortgage Co.*, 79 *Ga.* 213, and numerous others of its class, in which the lender received the borrower's application, passed upon it for himself, and for himself decided whether or not the security was good and the terms offered satisfactory.    Here Barnett passed upon these and all kindred questions for the lender, manifestly with authority so to do, which was either general or limited by instructions not disclosed.    If this does not amount to agency, we have no conception of what agency is."

3, 4.    O. A. Coleman testified as a witness for the plaintiff. In the motion for a new trial complaint was made that the court erred in excluding certain matter alleged to be testimony given by him, in Taliaferro superior court, in the case of Sackett *v.* Stone, which was offered for the purpose of impeaching his testimony in the present case, it being stated in the motion that the proper foundation was laid for the introduction of such evidence to impeach him, by calling the witness's attention to the time when and the place where the alleged contradictory statements were made.    From the fact that the motion sets out something more than a page of what purports to be testimony delivered by Coleman in the case of Sackett *v.* Stone, and then alleges that movant " offered the foregoing testimony of Coleman for the purpose of impeaching his evidence delivered in the case at bar," and " This evidence the court ruled out," we think it apparent that a written report or brief of testimony alleged to have been given by Coleman in the trial of that case was offered in evidence to impeach him.    A reference to Coleman's testimony in the brief of

the evidence in the present case shows this must be true.    He swore:   " I testified in the case of .Soloman Sackett et al. *v.* Mary E. Stone, in Taliaferro superior court, in February, 1901.    I don't know whether this is correct or not, but I presume so."    Evidently he must have been referring to a report or statement of his testimony in that case.    Further in his testimony he said:    " I don't know why I should be held responsible for what the reporter says in the report of what I said in the last case.    I have never read the testimony over.    All I undertook to do was to tell the truth, as I do now."    If this view of the matter be not correct, then it is certain that the motion does not disclose in what manner it was sought to prove what the testimony of Coleman was in the Sackett–Stone case.    A stenographic report or brief of the testimony alleged to have been given by Coleman in the other case was not competent evidence, without proof of its genuineness and correctness.    *Hardeman* v. *English,* 79 *Ga.* 387.    See also *Cox* v. *State,* 64 *Ga.* 374 (5); 1 Thompson on Trials, § 504.    No such proof appears to have been made or offered in this case. .The reason upon which the trial judge excluded the report we think was wrong, but the ruling was correct.    "If testimony was properly rejected, the ruling of the court will be sustained, although he may have given an insufficient, or even a wrong reason therefor."    *Smith* v. *Page,* 72 *Ga.* 539.

> *Judgment affirmed.    All the Justices concur.*