25429. WILLIAMSON, INMAN & COMPANY INC. *v.* THOMPSON.

DECIDED JULY 15, 1936. REHEARING DENIED JULY 28, 1936.

*Hooper & Hooper, Arnold, Gambrell & Arnold,* for plaintiff in error.

*Sutherland, Tuttle & Brennan,* contra.

JENKINS, P. J. 1. When this case was previously before this court, it was held: "In the absence of any contrary contractual stipulation, the general rule is that an agent employed to sell commodities upon commission for his principal, such as cotton, may recover his commissions for procuring purchasers with whom valid contracts are made, although the purchasers later are found to be financially unable to comply with the terms of their contract; subject to certain limitations regarding the good faith of the agent. The commission is earned, in such a case, when the agent finds an acceptable purchaser with whom a valid contract is made. . . Such an agent is not an insurer of the ability of the purchasers procured by him, if they are accepted as satisfactory by the principal and binding contracts of sale are made with them by the principal; but the agent is bound to act in good faith toward his principal. He can not fraudulently put off insolvent purchasers on his principal, and thus entrap the principal. *Payne* v. *Ponder,* 139 *Ga.* 283, 287 (77 S. E. 32)." *Williamson* v. *Thompson,* 50 *Ga. App.* 564 (179 S. E. 289). The plaintiff, suing a seller for commissions for obtaining purchasers and written contracts for the sale of cotton, in his petition pleaded that the defendant agreed to pay him "a commission of fifty cents per bale in negotiating said contracts;" that formal contracts were executed and confirmed by the defendant, and "defendant accepted said [named corporations] as purchasers satisfactory to defendant." Denying the conclusions stated, the defendant filed an answer admitting the execution of the alleged contract, but pleaded two defenses. The first was that although the plaintiff at the time of entering into the contract sued on was acquainted with the financial condition of the purchasers, and that they were unable to purchase and pay for such amount of cotton, and he had every opportunity of knowing this, he "concealed this fact from this defendant," represented the purchasers to defendant as being solvent, and "did not, as agent for this defendant in the purchase of said cotton, deal with his principal in good faith, which the law requires of such agent, and

reveal to his principal the financial condition of such purchasers." The second defense was that "it is the universal custom of the buyers and sellers of cotton, in this territory . . where this petitioner lives, that commissions to brokers for sale of cotton to cotton mills and others are never due or payable until there is an actual delivery of cotton and the contract complied with according to its terms as to payment;" that plaintiff "knew of this custom, . . and that such custom entered into and became a part of the contract sued upon in this case;" and that "under this custom, this cotton never having been received by the purchaser and without fault upon the part of this defendant, who was ready at all times to carry out said contract in good faith, no commissions ever became due to petitioner under said contract."

As to the first defense, this court further held that "evidence as to the insolvency of these purchasers would not be admissible, unless the defendant could show that the plaintiff had knowledge thereof," and, without passing on the sufficiency of the evidence as to either defense, reversed the judgment in favor of plaintiff on the ground that the court had erroneously restricted defendant's right of cross-examination of the plaintiff on the question of rumors heard by him "as to the bad financial condition of the purchasers prior to the time they made the contracts to purchase this cotton." In the instant trial, which resulted in a verdict in favor of plaintiff, there was no exception on account of any limitation of cross-examination, and the plaintiff appears to have been fully cross-examined. He explained that his statement at the first trial that he had heard in the early part of 1929 (before the sale contracts were executed in July, 1929), "little rumors" that the purchasers "were in bad shape," but "did not know anything about it," was due to a "misunderstanding of the question;" and he testified that in fact he did not hear such rumors until 1930, after the sale. There being no other evidence as to any "bad faith" by plaintiff, and upon this question a verdict for the defendant not being demanded under the plaintiff's testimony as stated, the grounds of exception, as to this defense, are without merit.

2. On the second defense, as to the alleged universal custom not to pay brokerage commissions until cotton was both shipped and paid for, although several witnesses fully sustained this plea, the plaintiff denied the existence of such a custom, and that there

was any custom barring a broker from receiving his commission when a contract was canceled or abrogated by a principal, or when the buyer defaulted and refused delivery. It was undisputed that the instant contracts were abrogated, and the purchasers defaulted solely because of their financial inability to receive and pay for the cotton, and that the defendant seller in this suit for commission was in no way at fault. However, the existence of the custom itself being in issue under the plaintiff's testimony, the grounds of exception, as to this defense, are without merit.

3. The court did not err in excluding, on the ground of irrelevancy, testimony by the plaintiff on cross-examination that he had not sued another corporation for cotton-brokerage commissions on a contract where the purchaser therein had refused delivery. Even if, as contended, such testimony might have tended more or less to show the existence of the custom pleaded, and the plaintiff's knowledge thereof, proof of such a mere failure to sue would have injected into the case so many collateral questions as to the motives or reasons of the plaintiff as to confuse the jury. Moreover, the defendant was allowed to introduce testimony by the vice-president of the corporation in question, that the plaintiff had never brought any suit for the commissions.

4. The exclusion of testimony by a witness that "in the spring of 1930" the purchasers in the brokerage contracts here involved "were bankrupt" was not prejudicial to the defendant, since, although the objections and the exclusion were based on different grounds, this evidence would have been irrelevant on the issue whether or not the purchasers were insolvent in July, 1929, at the time of the contracts, and whether the plaintiff then knew or ought to have known of the insolvency. See *Smith* v. *Page,* 72 *Ga.* 539, 544; *Barksdale* v. *Security Investment Co.,* 120 *Ga.* 388 (4), 395 (47 S. E. 943); *Gordon* v. *Spellman,* 148 *Ga.* 394, 400 (5) (90 S. E. 1006); *Lamon* v. *Perry,* 33 *Ga. App.* 248 (*b*); 251 (125 S. E. 907).

5. A witness, who in his interrogatories had previously testified that he had worked as bookkeeper for the purchaser mills until January 15, 1929, and whose testimony showed that his knowledge of their financial condition was derived from their books and records, was asked to "state whether or not, from your knowledge of the financial condition of said mills, they were in position to

receive and pay for all the cotton contracted for by them in the summer of 1929, and for delivery the early part of 1930." The witness answered: "These mills were not in a position to stand any loss of any nature in 1929. This cotton was not purchased against sales of cotton, and was therefore speculative in nature. If cotton had advanced in price, these contracts would have doubtless been good. Cotton having declined in price, the mills were in no position to stand the loss." Exception is taken to the exclusion of this testimony on the objection that the records would be the best evidence, that the witness was not shown to have any particular or expert knowledge of the ability of the mills to put their assets in liquid form to meet their bills, and that he was not shown to have been connected with either of the two mills after he left their employment in January, 1929. While the books of the mills, at the time of the trial, were in North Carolina, where the purchasers did business, and the absence of the books outside of the jurisdiction of the trial court might otherwise have authorized the admission of parol evidence to their contents, yet, the witness having testified by deposition, it was not made to appear that they were not available where the witness was examined by deposition. It does not appear that the witness had anything to do with the books or had any direct knowledge of his own, expert or otherwise, as to the solvency of the companies after he left their employment as bookkeeper in January, 1929, so as to extend his knowledge of their financial condition to the time when the purchasing contracts in question were executed in July, 1929, and to the time about which he was asked to testify, "the early part of 1930," when delivery of the cotton was to be begun. Moreover, the answer that "these mills were not in a position to stand any loss of any nature," was an indefinite general conclusion, which might or might not have related to the question of insolvency in July, 1929, and to the plaintiff's knowledge thereof. For these reasons, it was not error to exclude the testimony.

6. Exception is taken to the exclusion of testimony by the vice-president and treasurer of the defendant company, that the president and owner of the stock in both purchasing mills "at first tried to conceal the matter that he did not want delivery of the cotton, and when he found we were not delaying the cotton he admitted that he could not take it," on the ground that the state-

ment as to the admission was hearsay, neither the purchasing mills nor its officer being a party to this case. Even were the objection not well taken, the defendant was not prejudiced by the exclusion of the evidence, since similar testimony as to the failure and the financial inability of the purchasers to accept delivery at the time fixed by the contracts was admitted without objection, and there was no controversy under the evidence as to the readiness, willingness, and ability of the defendant seller to perform its obligations under the contracts of purchase. For a like reason, there was no prejudicial error in the exclusion of testimony from the same witness that the president of the purchasing mills stated to the witness that he "thought they could pay for it later."

7. Testimony by the witness last mentioned, that when he went to North Carolina in January, 1929, one of the purchasing mills "had not operated for six or eight months," even if not properly excluded on the grounds of objection stated that "the witness did not show the source of his information," and that "it was a conclusion of the witness," was not sufficiently relevant to the question of solvency of the purchaser at the time of the contract in July, 1929, to have prejudiced the defendant by its exclusion; the testimony showing that cotton mills frequently shut down temporarily in periods of inactivity; and the excluded testimony, even if admissible, showing that the representative of the defendant, equally with or to a greater extent than the plaintiff, had knowledge of the closing in January, 1929, and such a fact having no relevancy on the question of the good faith of the plaintiff in not disclosing to the defendant facts affecting solvency, which the answer charges that the plaintiff but not the defendant knew.

8. The instructions relating to the universality and generalness of the custom in the cotton trade, as alleged by the defendant, that brokers were not entitled to commissions until the cotton was both shipped by the seller and paid for by the purchaser, were substantially in accord with the Code, § 20-704(3) and decisions relating thereto, and were not erroneous as improperly defining such a custom or as argumentative.

9. Exception was taken to repeated instructions that while the plaintiff had the burden of proving the allegations of his petition as to a sale of the cotton to acceptable buyers, under the alleged

contracts, the defendant had the burden of proving by a preponderance of evidence both or either of its two defenses: that the plaintiff acted in bad faith in not disclosing to the defendant his alleged knowledge of the purchaser's insolvency; or that there was a general custom precluding the plaintiff from collecting commissions unless there was a delivery, acceptance, and payment by the purchasers for the cotton. The petition pleaded nothing as to either of these defenses; and the plaintiff merely invoked the rule of law making his agreed brokerage commissions earned and payable when he found a purchaser acceptable to the seller, ready, able, and willing to buy, and consummated valid contracts of purchase. The defendant admitted that the alleged sales contracts were made, and relied upon the two special defenses set up in its amended answer.

(a) "The burden of proof generally lies upon the party asserting or affirming a fact and to the existence of whose case or defense the proof of such fact is essential. If a negation or negative affirmation be so essential, the proof of such negative lies on the party affirming it." Code, § 38-103. Where a plea or answer merely elaborates a general denial of the averments of a petition, and is in effect only a detailed plea of the general issue, or is evidential or argumentative in character as to matters unstricken on special demurrer, there is no such affirmative defense as will place the burden on the defendant to prove such matters. But if the plea or answer admit essential facts of the petition, which show a right of recovery, but set up other facts in justification or avoidance, or other special matters not merely elaborating or explaining a general denial, there is an affirmative defense, the burden of proving which by a preponderance of the evidence will rest on the defendant. *Trammell* v. *Atlanta Coach Co.*, 51 *Ga. App.* 705, 713 (181 S. E. 315); *McCrackin* v. *McKinney*, 52 *Ga. App.* 519 (183 S. E. 831); and cit.

(b) The general presumption of good faith accompanying all contracts and contractual relations, and the petition not setting up the good faith of the plaintiff as a part of his alleged right of recovery, the allegations in the answer as to bad faith, to defeat the claim, constituted an affirmative defense, the burden of proving which was on the defendant.

(c) "The custom of any business or trade shall be binding

only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract." Code, § 20-704(3). "The surrounding circumstances are always proper subjects of proof to aid in the construction of contracts." § 38-505. "In like manner evidence of known and established usage shall be admissible for the same purpose as well as to annex incidents." Code, § 38-506. "Unless credit is specifically agreed on or is the custom of the trade, the purchase-money is due immediately." § 96-106. A similar rule exists, in the absence of express agreement or a contrary custom, constituting part of the contract, as to the payment of brokerage commissions. § 4-213. Among other matters which § 38-112 provides are "matters of public knowledge," which "shall be judicially recognized without the introduction of proof," are "general customs of merchants." However, to be thus judicially recognized, the custom must be one about which there is and can be no dispute and which is known of all men. See *Paulk* v. *Union Banking Co.*, 46 *Ga. App.* 815, 817 (169 S. E. 313). "It is unnecessary to plead general customs or usages of which the court will take judicial notice; but to invoke a custom or usage relating to a particular trade or locality, distinct pleading is necessary." *Electric City Lumber Co.* v. *New York Underwriters Ins. Co.*, 43 *Ga. App.* 355, 357 (158 S. E. 620), and cit.; *Durkee Famous Foods Inc.* v. *Selig Co.*, 48 *Ga. App* 711, 713 (172 S. E. 824), and cit.; 17 C. J. 516, 517. See also *Hamby* v. *Truitt*, 14 *Ga. App.* 515 (2), 518 (81 S. E. 593). "The burden of proving a custom or usage not judicially noticed is upon the party asserting it." 17 C. J. 519, and cit. Where the existence and universality of a custom are not so generally known and recognized as to be the subject of judicial notice, so unequivocal and uncontradicted that the court may hold as a matter of law that such a custom existed and entered into the contract, such questions are for the jury. *Branch* v. *Palmer*, 65 *Ga.* 214; *Laucheimer* v. *Jacobs*, 126 *Ga.* 261 (55 S. E. 55); 6 Stand. Enc. Proc. 333, and cit. In this case the existence and universality of the alleged custom in the cotton trade of the locality as to the time of payment of brokerage commissions were not proper matter for judicial notice, but were pleaded only by the defendant in what amounted to an affirmative defense. Therefore the bur-

den of proving this defense was on the defendant, and the court did not err in so charging.

10. The court instructed the jury as follows: "The agent, however, must act in good faith, and he can not recover if he has fraudulently put off insolvent parties on his principal. If the agent *knew* of the insolvency of the mills, or either of them, if they were insolvent at the time the contracts were made, and he submitted them to his principal, then the agent can not recover his commissions." Exception is taken to this charge on the ground that it made *actual knowledge* of the insolvency of the purchasers the test of the plaintiff agent's good faith and right to recover; "whereas it is the law that if the agent by the exercise of ordinary care and diligence could have known of the insolvency of the mills, or had reasonable grounds of knowing of the insolvency of the mills, then he would be chargeable with knowledge thereof, and his rights would be the same as if he had knowledge thereof, and he could not recover in this case;" and "furthermore, if said agent had reasonable grounds to suspect that said mills were insolvent, he could not in good faith proceed to consummate said contracts in behalf of the defendant and recover in this case, and the law would consider that he had acted in bad faith." Elsewhere the court charged that the burden was on the defendant to prove all of its defenses, and that the plaintiff would be entitled to recover, unless the defendant showed that "the agent acted in bad faith, or that one or more of the mills was insolvent, and that the agent *knew* about it, or that there was a general custom as to payment of commission as claimed by the defendant." The amended answer pleaded not only actual knowledge by the plaintiff of the insolvency and inability of the purchasers to meet the obligations of their contracts, but that he had every opportunity of knowing this, yet represented them to the defendant as solvent, and consummated the contracts with them as solvent purchasers. It set forth that the actions and silence of the plaintiff constituted such an absence of good faith by the plaintiff as precluded a recovery. This pleading, if supported by evidence, would thus present the issue, not only as to whether the plaintiff had actual knowledge of the purchaser's insolvency, but whether his knowledge of material facts, such as rumors of insolvency, constituted bad faith which would debar a recovery.

The defendant introduced in evidence the plaintiff's testimony given at the first trial: "I don't know whether the financial condition of the Great Falls Mill in *the early part of 1929* was bad and it was deeply in debt or not. As to whether or not I have heard it talked around that they were in bad shape, *I had heard little rumors,* but I did not know anything about it. I don't know what rumors I had heard about the mill in 1929, as to their condition." Although in the second trial the plaintiff testified that his previous testimony as to hearing the rumors that the mill was in bad shape in "the early part of 1929" was caused by his "misunderstanding of the question," and that he had not in fact heard them until 1930, after the execution of the sales contracts in July, 1929, the defendant was entitled to any benefit which the jury might see fit to give under the previous statement, as an admission by the plaintiff, considering the statement together with the subsequent explanation. Although the plaintiff denied that he had any knowledge of the insolvency, or of facts indicating the inability of the purchasers to pay for the cotton, before the execution of the contracts which he consummated as broker, he testified that he had lived about two years prior thereto in the town of about 11,000 people, where an office of the purchasers was located about eight or ten blocks from his office; that he saw the representative of the purchasers often, and was "about as intimate as a broker can get with a cotton-mill man;" that he had never "made any investigation from anybody in regard to the financial condition of the mills;" that "there was a bank at [the town] that I did business with;" that "I did not make any inquiry about these mills nor any of the mills;" that "if I myself had been granting a long line of credit, I think I would have made a thorough investigation. If I had been granting the credit, I would have gone to the bank and to everybody that I thought would be able to give me any information." But, as he contended, since the defendant was "granting the credit, that was their responsibility;" and that "all of this investigation that I made was after the sale and not before."

While it is true, as contended by the plaintiff in his testimony, that the ultimate responsibility of granting the credit rested upon the defendant, it is also true that the plaintiff acted in the capacity of the defendant's broker and agent; and it is a well-recognized

principle of law that the relation of principal and agent, being fiduciary in character, demands of the agent the utmost loyalty and good faith to his principal, and that any breach of this good faith, whereby the principal suffers any disadvantage and the agent reaps any benefit, is a fraud of such nature as to preclude the agent from taking or retaining the benefit, including the claiming of any commission. *Williams* v. *Moore-Gaunt Co.,* 3 *Ga. App.* 756 (60 S. E. 372). In the instant case the pressure of the case lay, not on the question whether the plaintiff actually knew that the purchaser of the cotton was insolvent at the time the plaintiff negotiated the sale (since there was no evidence that the plaintiff actually knew of any insolvency), but on whether the plaintiff acted in good faith in not informing the defendant of the rumors which he had heard, if such was a fact, concerning the insolvency of the purchaser before the consummation of the sale through the plaintiff. While the plaintiff sought to explain his previous testimony indicating that he had heard of the rumors as to insolvency before the trade was consummated, by stating that it was only after the sale, and not before, that this information came to him, the defendant was entitled to whatever benefit the jury might see proper to give from the previous admission in the former trial. If the jury should believe that at the time the trade was consummated the plaintiff had heard rumors as to the insolvency of the purchaser, and, while withholding such knowledge from his principal, proceeded to consummate the trade on the idea that upon the principal and not himself was the responsibility of granting the credit, the jury would have been authorized to find that the plaintiff failed to act in good faith with his principal, and in such event he would not be entitled to recover his commission, notwithstanding the fact that he may not have had actual knowledge that the rumors previously testified to were true and correct. The testimony of the defendant at the first trial, his explanatory testimony, and the additional circumstances of the transaction, were sufficient to carry to the jury the question as to the good faith of the plaintiff. The reasonable and natural interpretation of the charge to the jury as to whether the plaintiff "knew" of the insolvency of the purchasers limited such knowledge to actual knowledge, without any reference to or consideration of the testimony as to what the plaintiff had heard, as affecting the question

of good faith. As this was perhaps the main vital question presented under the defenses to the action, the instruction complained of was error prejudicial to the defendant. This error was not cured by the language immediately following that excepted to: "It is the duty of the agent to furnish to his principal all facts and information that come to his knowledge." Having previously charged in effect that the plaintiff agent must have *known* of the buyer's insolvency, the facts here referred to must naturally have been understood to have reference to knowledge of insolvency. Under the previous decision in this case, good faith required the disclosure of rumors "tending to show" insolvency. But even as to such duty of disclosure, the language was not sufficient, since the legal result of the agent's failure so to disclose was not stated, and it was not charged that such failure might, if the jury so found, constitute bad faith preventing a recovery. The court had just charged in effect, as to the defense of bad faith, that the plaintiff was entitled to recover unless he actually knew of any insolvency. The evidence was sufficient to take to the jury the issue made by the previous admission of the plaintiff and his subsequent explanation thereof as to whether he knew of the rumors of insolvency before his consummation of the trade, and, if so, whether his failure to disclose the same constituted bad faith. Upon this ground, and for these reasons alone, the judgment refusing a new trial must be reversed.

*Judgment reversed. Stephens, J., concurs. Sutton, J., dissents.*

SUTTON, J. I dissent, because I am of the opinion that the charge of the court sufficiently covered the case, and that the error on which the judgment is reversed is not sufficient to require a reversal.